UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
                       :

LADMEN PARTNERS, INC.,             :

                 Plaintiff,  :      07 Civ. 0976 (LAP)

                       :

   - against -                :

                       :

GLOBALSTAR, INC., et al.,        :

                       :

            Defendants.  :

                       :
--------------------------------------------------------- X

 

### MEMORANDUM OF LAW OF WACHOVIA CAPITAL MARKETS, LLC, J.P. MORGAN SECURITIES, INC., AND JEFFERIES & COMPANY, INC., IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED COMPLAINT

                             CLEARY GOTTLIEB STEEN & HAMILTON LLP
                             One Liberty Plaza
                             New York, New York 10006
                             Tel: (212) 225-2000
                             Fax: (212) 225-3999

                             *Attorneys for Defendants Wachovia Capital Markets, LLC, J.P. Morgan Securities, Inc., and Jefferies & Company, Inc.*

Of Counsel:
   Mitchell A. Lowenthal
   Victor L. Hou
   Timothy M. Haggerty

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................ i

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A. The Globalstar IPO ............................................................................................ 2

    B. Globalstar and its Business ................................................................................. 2

ARGUMENT .................................................................................................................... 3

    POINT I:  PLAINTIFF LACKS STANDING BECAUSE
    IT CANNOT TRACE ITS PURCHASE TO
    THE OFFERING DOCUMENTS ............................................................................. 3

    POINT II:  THE CSAC FAILS TO PLEAD A MATERIAL
    MISTATEMENT OR ACTIONABLE OMISSION ................................................. 5

        A.  The Legal Standard ...................................................................................... 5

        B.  Satellite Constellation Allegations ............................................................. 7

        C.  Voice Quality Allegations .......................................................................... 18

        D.  Subscriber Growth Allegations .................................................................. 21

        E.  Ancillary Terrestrial Component Allegations ............................................ 23

    POINT III:  PLAINTIFF FAILED TO EFFECT SERVICE
    WITHIN THE PERIOD REQUIRED BY THIS COURT'S
    ORDER, FEDERAL RULE OF CIVIL PROCEDURE 4(M),
    AND THE STATUTE OF LIMITATIONS .............................................................. 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

15 U.S.C. § 77k(a) ...................................................................................... 5, 8

15 U.S.C. § 77l(a)(2)................................................................................... 5

15 U.S.C. § 77m ......................................................................................... 25

Fed. R. Civ. P. 4(l) ..................................................................................... 25


## Cases

Acito v. IMCERA Group, Inc.,
47 F.3d 47 (2d Cir. 1995) ........................................................................... 14

Backhaus v. Streamedia Commc'ns, Inc.,
No. 01 Civ. 4889, 2002 U.S. Dist. LEXIS 14960
(S.D.N.Y. Aug. 14, 2002) ........................................................................... 11

Backman v. Polaroid Corp.,
910 F.2d 10 (1st Cir. 1990).......................................................................... 22

Barnes v. Osofsky,
373 F.2d 269 (2d Cir. 1967).......................................................................... 3

Bell Atl. Corp. v. Twombly,
127 S. Ct. 1955 (2007).................................................................................. 6

Denny v. Barber,
576 F.2d 465 ................................................................................................ 8

Freedman v. Value Health, Inc.,
135 F. Supp. 2d 317 (D. Conn. 2001).......................................................... 8

Gross v. Summa Four, Inc.,
93 F.3d 987 (1st Cir. 1996)........................................................................... 20

Gustafson v. Alloyd Co.,
513 U.S. 561 (1995)...................................................................................... 5

Halperin v. eBanker USA.com, Inc.,
295 F.3d 352 (2d Cir. 2002).......................................................... 6-7, 21

Higginbotham v. Baxter Int'l., Inc
495 F.3d 753 (7th Cir. 2007). ........................................................................ 17

In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.,
2007 WL 2615928 (S.D.N.Y. 2007)................................................................. 7

In re Axis Capital Holdings Ltd. Sec. Litig.,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)............................................................. 7

In re Cabletron Sys., Inc.,
311 F.3d 11 (1st Cir. 2002)............................................................................. 16

In re Cosi, Inc. Sec. Litig.,
379 F. Supp. 2d 580 (S.D.N.Y. 2005)............................................................. 6

In re Donald J. Trump Casino Sec. Litig.,
7 F.3d 357 (3d Cir. 1993) .............................................................................. 13

In re Global Crossing, Ltd. Sec. Litig.,
313 F. Supp. 2d 189 (S.D.N.Y. 2003)............................................................. 3, 4

In re Hyperion Sec. Litig.,
No. 93 Civ. 7179, 1995 U.S. Dist. LEXIS 10020
(S.D.N.Y. July 14, 1995) (Mukasey, J) ......................................................... 16

In re Initial Public Offering Sec. Litig.,
227 F.R.D. 65 (S.D.N.Y. 2004),
vacated and remanded on other grounds, 471 F.3d 24 (2d Cir. 2006).............. 4

In re Livent, Inc. Noteholders Sec. Litig.,
151 F. Supp. 2d 371 (S.D.N.Y. 2001)............................................................. 5

In re N2K, Inc. Sec. Litig.,
82 F. Supp. 2d 204 (S.D.N.Y. 2000)............................................................... 5-6

In re OPUS360 Corp. Sec. Litig.,
Civ. A. No. 01-2938, 2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) ................. 24

In re Parmalat Sec. Litig.,
412 F. Supp. 2d 392 (S.D.N.Y. 2006)............................................................. 6

In re Silicon Image, Inc. Sec. Litig.,
2006 WL 1709424 (N.D. Cal. 2006) .............................................................. 17

In re Ultrafem Inc. Sec. Litig.,
91 F. Supp. 2d 678 (S.D.N.Y. 2000) (Preska, J.)............................................. 7

Jackson v. Nat'l Life Ins. Co. v. Merrill Lynch & Co.,
32 F.3d 697 (2d Cir. 1994)..................................................................... 21

Krim v. PCOrder.com, Inc.,
210 F.R.D. 581 (W.D. Tex. 2002) ......................................................... 4

Lorber v. Beebe,
407 F. Supp. 279 (S.D.N.Y. 1976)......................................................... 3-4

McKibben v. Credit Lyonnais,
1999 WL 604883 (S.D.N.Y. Aug. 10, 1999) (Preska, J.)...................... 25

Miller v. Lazard, Ltd.,
473 F. Supp. 2d 571 (S.D.N.Y. 2007).................................................... 6

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000)................................................................... 16

P. Stolz Family P'ship L.P. v. Daum,
355 F.3d 92 (2d Cir. 2004)..................................................................... 11

Rapoport v. Asia Elecs. Holding Co.,
88 F. Supp. 2d 179 (S.D.N.Y. 2000)...................................................... 5

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004)................................................................... 7, 11

Saslaw v. Askari,
No. 95 Civ 7641, 1997 WL 221208
(S.D.N.Y. Apr. 25, 1997) (Preska, J.).................................................... 11

Shapiro v. UJB Fin. Corp.,
964 F.2d 272 (3d Cir. 1992)................................................................... 7

Shields v. Citytrust Bancorp., Inc.,
25 F.3d 1124 (2d Cir. 1994)................................................................... 13

Yung v. Lee,
432 F.3d 142 (2d Cir. 2005)................................................................... 5

Zucker v. Quasha,
891 F. Supp. 1010 (D.N.J. 1995) ........................................................... 20

**Other Authorities**

iv

17 C.F.R. § 230.175 ............................................................................................................ 11

Statement of Financial Accounting Standards No. 154 ...................................................... 14

The Underwriter Defendants[1] submit this memorandum of law in support of their motion to dismiss the Consolidated Second Amended Complaint (the "CSAC").

## PRELIMINARY STATEMENT

Satellites are a risky business.  They are costly and fragile machines.  If they survive the controlled explosion of launch, they will enter orbit in the inhospitable reach of space hundreds of miles above Earth, only to endure hazards such as the sun's punishing radiation, solar flares and space debris.  Thousands of miles away, satellite operators must try to control entire constellations of these spinning masses of antennae and panels amidst the vagaries of outer space.  Satellites stop working.  They slip out of orbit and ultimately fall from the sky.

Not surprisingly in this industry of inherent risk, the fortunes of satellite companies can be perilous.  Their enterprising ranks have been thinned by bankruptcy and commercial failure.  Investors were well advised of these risks.  Here, Plaintiff, a putative investor in a public offering by Globalstar, Inc. ("Globalstar" or the "Company") – itself a satellite communications firm emerging from bankruptcy – assumed those risks.  In the prospectus and registration statement filed in connection with Globalstar's IPO (the "Offering Documents"), all of these inherent risks were amply and prominently disclosed, as were specific operational risks associated with the Company's existing satellite constellation.  In particular, potential investors were warned that the Company was aware of operational difficulties that could result in the loss of commercially viable service until replacement satellites could be deployed.

---

[1]     The Underwriter Defendants are JP Morgan Securities, Inc., Jefferies & Company, Inc., and Wachovia Capital Markets, LLC.  The Underwriter Defendants adopt the arguments set forth in Globalstar Inc.'s Memorandum of Law in Support of the Motion to Dismiss the CSAC, to the extent those arguments apply to the claims asserted against the Underwriter Defendants.

In February 2007, approximately three months *after* the offering, Globalstar announced that it was unable to correct the technical problems it had previously identified, and that these problems were occurring more rapidly than the Company had previously anticipated.

Nevertheless, like night follows day, litigation promptly ensued.   In seeking relief against the Underwriter Defendants, the lead plaintiff ("Plaintiff") attempts to transform them into insurers.  But Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") requires disclosures – not guarantees – and the Offering Documents were more than adequate to enable investors to appreciate the risks inherent in purchasing Globalstar securities.

### STATEMENT OF FACTS

**A.     The Globalstar IPO**

Well before Globalstar's November 3, 2006, initial public offering ("IPO"), it had issued shares ("Old Shares") to executives, affiliates and certain others, including shares issued in connection with the Company's emergence from bankruptcy.  At the closing of the IPO, the Company had over 70 million common shares outstanding; barely 10% of which  (7.5 million) were issued in the IPO (the "IPO Shares").  All of the IPO Shares – and at least 10,648,434 of the Old Shares – were freely tradeable when the IPO became effective.

**B.     Globalstar and its Business**

Globalstar provides mobile satellite communication services that are typically used for "voice and data communications in situations where existing terrestrial wireline and wireless communications networks are impaired or do not exist."  Prospectus at 2.[2]  Globalstar's services included two-way voice communication through mobile handsets, two-way data

---

[2]     The Prospectus is attached as Exhibit 1 to the Declaration of William F. Adler, made and filed in support of Defendants Globalstar Inc.'s Motion to Dismiss the CSAC (the "Adler Declaration").

transmissions (called "Duplex") and one-way data transmissions (called "Simplex") which provide tracking information.  Id. at 1.  The Company's objective, which it acknowledged that it remained "unable" to accomplish at the time of the IPO, "is to establish a worldwide service network."  Globalstar had 236,515 subscribers as of June 30, 2006 (the most recent period reported in the Offering Documents).

In February 2007, Globalstar issued a Form 8-K announcing that its satellites were degrading at a rate that was "faster than previously experienced and faster than the Company had previously anticipated," and that the projected lifespan of its then-current satellite constellation could be shorter than had been disclosed in the Offering Documents.  CSAC ¶ 70.[3] The Company warned that this degradation (if uncorrected) could cause the satellites to cease to support certain types of communications.  Id.

### ARGUMENT

### POINT I:  PLAINTIFF LACKS STANDING BECAUSE IT CANNOT TRACE ITS PURCHASE TO THE OFFERING DOCUMENTS

Standing under the Securities Act  is limited to a "narrow class of persons" – *the people who actually purchased securities subject to those offering documents*.  Barnes v. Osofsky, 373 F.2d 269, 273 (2d Cir. 1967).  An investor whose shares entered the market in *any manner* other than pursuant to an allegedly defective offering document has no standing to bring suit.  Thus, recovery under Section 11 is only available to those who can affirmatively "trace" the shares that they purchased to the allegedly defective prospectus or registration statement.

Plaintiffs bear the burden of proving tracing.  In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189 (S.D.N.Y. 2003).  Just as a plaintiff cannot recover unless he *proves* that his shares are traceable to the defective materials, he *has not stated a cause of action* unless

---

[3]    The February 5, 2007, Form 8-K is attached as Exhibit 2 to the Adler Declaration.

he alleges that this element of his claim is satisfied.  Id. at 208.  This requirement is strictly

applied; it is "insufficient that [plaintiff's] stock '*might*' have been issued pursuant to a defective

[registration] statement.  A plaintiff must show that it actually <u>was</u> so issued."  Lorber v. Beebe,

407 F. Supp. 279, 287 (S.D.N.Y. 1976) (emphasis added) (citing Barnes v. Osofsky, 373 F.2d

269, 273 n.2 (2d Cir. 1967)).  "[P]laintiffs who purchased securities not issued pursuant to the

misleading registration statement lack standing as surely as the purchasers of other securities

entirely."  In re Global Crossing, 313 F. Supp. 2d at 208.

    Where shares enter the market through multiple sources, tracing  is "virtually

impossible."  See In re Initial Public Offering Sec. Litig., 227 F.R.D. 65, 118 (S.D.N.Y. 2004),

vacated and remanded on other grounds, 471 F.3d 24 (2d Cir. 2006).  In specific, when  IPO and

non-IPO securities are held in fungible bulk, any particular shares *cannot* be traced to the IPO.

See Krim v. PCOrder.com, Inc., 210 F.R.D. 581, 586 (W.D. Tex. 2002) (holding that plaintiffs

"must demonstrate *all* stock for which they claim damages was actually issued pursuant to a

defective statement, not just that it might have been, probably was, or most likely was, issued

pursuant to a defective statement.") (citation omitted) (emphasis in original).

    Here, Plaintiff purports to have purchased shares "pursuant to the IPO."  But that

conclusory pleading is contrary to Plaintiff's own certification, which reports that it purchased

8,700 shares – only some of them (7,000) on the date of the IPO and at the $17 per share IPO

price.  The balance were purchased at other than the IPO price and after (sometimes weeks after)

the IPO become effective.  By definition, these 1,700 shares were purchased in the secondary

market,  and from the face of the Offering Documents, it is clear that in addition to the 7.5

million IPO Shares, at least 10.6 million other unrestricted shares were *already outstanding* and

freely tradeable without restriction or further registration *when the IPO became effective*.

Prospectus at 119.  In a market consisting of both IPO Shares and Old Shares, it is "virtually impossible" for Plaintiff to trace its shares to the IPO.

Although Plaintiff alleges that it purchased "pursuant to the IPO," this Court "need not feel constrained to accept as truth conflicting pleadings that make no sense . . . or that are contradicted either by statements in complaint itself or by documents upon which its pleadings rely."  In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001); Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).  Here, the face of the Offering Documents demonstrates that the plaintiff cannot prove an essential element of the case, dismissal is proper.  Because Plaintiff has not adequately pleaded – and objectively cannot establish – that the shares it allegedly purchased trace to the Offering Documents, it lacks standing with respect to such purchases.[4]

### POINT II:  THE CSAC FAILS TO PLEAD A MATERIAL MISTATEMENT OR ACTIONABLE OMISSION

#### A.    The Legal Standard

To state a claim under Sections 11 and 12 of the Securities Act, plaintiffs must allege that the Offering Documents contained "an untrue statement of a material fact or omitted to state a material fact . . . ."  15 U.S.C. § 77k(a); 15 U.S.C. § 77l(a)(2).

Statements are not addressed in isolation, but rather in the context of the offering documents as a whole.  See In re N2K, Inc. Sec. Litig., 82 F. Supp. 2d 204, 209 (S.D.N.Y.

---

[4]    Section 12(a)(2) links standing to purchases actually made in the initial public offering; Section 12(a)(2) relief is not available for purchases made in secondary market trading.  See Gustafson v. Alloyd Co., 513 U.S. 561, 578 (1995).  To the extent that Plaintiff's purchases were made at prices other than the IPO price, and more than a month after the IPO, it simply lacks standing to state claims under Section 12(a)(2).  See Yung v. Lee, 432 F.3d 142, 148 (2d Cir. 2005) (upholding "the predominate conclusion that purchasers in private or secondary market offerings are precluded from bringing actions under Section 12(a)(2)") (quotations omitted).

2000).[5]  Moreover, although well-pleaded allegations must be accepted as true, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted).  "[B]ald assertions and conclusions of law" are insufficient.  In re Parmalat Sec. Litig., 412 F. Supp. 2d 392, 401 n.55 (S.D.N.Y. 2006) (internal quotations omitted).  Instead, plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face," and "nudge[] their claims across the line from conceivable to plausible."  Twombly, 127 S. Ct. at 1974.

The need to read offering documents as a whole is particularly compelling where – as here – they contain "cautionary language."  See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").  Thus, under the "bespeaks caution" doctrine, misrepresentations in offering documents can be rendered immaterial as a matter of law by "adequate cautionary language."  Id.  To be "adequate," the cautionary language must be prominent and specific and directed at the same risk that the plaintiff alleges was misrepresented or omitted.  Id.  The question for the court, then, is "whether the language provided matches the risk addressed."  Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007).  Applying this standard, "a complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested."

---

[5]     In addition to the CSAC, the Court can consider any materials relied upon or integral to the complaint as well as matters of public record.  In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 582 (S.D.N.Y. 2005) (collecting cases).

Halperin, 295 F.3d at 359 (emphasis in original).

### B.    Satellite Constellation Allegations

The CSAC alleges that the Offering Documents "falsely stated" [6] that Globalstar's current satellites (the "First Generation") would be "commercially viable" into 2010 and that the Company's next generation (the "Second Generation") satellites would begin to be deployed in 2009, so that there would be "no gap" in service between the end of the useful life of the First Generation and the deployment of the Second Generation.  CSAC ¶¶ 100-06; see also ¶¶ 5(c), 65-67, 107-10.  Plaintiff's "support" for the allegation that these representations were false at the time they were made appears to be the Company's disclosure three months after the IPO that "based on data recently collected from satellite operations," the Company had concluded that satellite degradation is "occurring at a rate much faster than previously anticipated" and that "the

---

[6]    All of Plaintiff's Section 11 claims are subject to the heightened pleading requirements of Rule 9(b) because they "sound in fraud." Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004); In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000) (Preska, J.).  Indeed, Plaintiff's claims brim with the type of "wording and imputations . . . classically associated with fraud," Rombach, 355 F.3d at 172.  See, e.g., CSAC ¶¶ 94 ("blatant misrepresentation"); 95 ("materially false and misleading"); 107 ("false and inconsistent with facts"); 113 ("patently false and materially misleading").  These are precisely the words Rombach held to require that Rule 9(b) be applied to Section 11 claims:  "that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued."  355 F.3d at 172 (emphasis in original).
Where a claim sounds in fraud, it will only survive Rule 9(b) if the plaintiff pleads: "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992).  And when claims allege intentional, knowing or reckless conduct, they "sound in fraud" and are subject to Rule 9(b), regardless of whether a plaintiff attempts to disclaim his own allegations – as Plaintiff does here (CSAC ¶ 116).  See In re Axis Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient."); In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig., 2007 WL 2615928, at *9 (S.D.N.Y. 2007) (quoting Rombach, 355 F.3d at 172 ("Plaintiffs assert that their Section 11 claims do not sound in fraud but the wording and imputations of the complaint are classically associated with fraud.")).

quality of two-communication services will decline and that by sometime in 2008 substantially all of the Company's currently in-orbit satellites will cease to be able to support two-way communications services."  CSAC ¶70.

But these allegations have more to do with the inability to see into the future than about the ultimate accuracy of the guarded predictions that were actually disclosed.  See Denny v. Barber, 576 F.2d 465, 470 ("In sum, the complaint is an example of alleging fraud by hindsight.  For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.").  Indeed, all of the CSAC's allegations about the viability of Globalstar's existing satellite constellation are based upon the Company's cautious predictions about its future operations *at the time that the Offering Documents became effective*.  See 15 U.S.C. § 77k(a) ("In case any part of the registration statement, *when such part became effective*, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . .") (emphasis added); Freedman v. Value Health, Inc., 135 F. Supp. 2d 317, 330 (D. Conn. 2001) (Sections 11 and 12 of the Securities Act "subject defendants to liability if, at the time of its effective date" a registration statement contained a misstatement or omission of material fact.").  In short, they are classic claims of fraud by hindsight.

The Offering Documents fully disclosed that many of the predictions in the Prospectus were just that – predictions – based on the Company's "*expectations* about the future operational performance of our satellites (including their projected lives), the expected strength of and growth of prospects of our existing customers and the markets that we serve".  Prospectus at 31 (emphasis added).  They further warned that these predictions and other statements "involve known and unknown risks, uncertainties and other factors that may cause the our actual

results, performance, or achievements or industry results to be materially different from any future results, performance or achievements expressed or implied by the statements," and identified the specific risks and uncertainties to include, among other things, "problems with respect to the construction, launch or in-orbit performance of our existing and future satellites" and the "performance of our system as a whole." Id.

    None of the cautionary predictions in the Offering Documents guaranteed that the existing satellite constellation would, in fact, remain commercially viable into 2010.  They simply stated that the Company's expectation that the satellite constellation would remain commercially viable into 2010.  This future prediction by the Company was explicitly qualified by critical factual predicates, such as the successful launch and deployment of the Second Generation of satellites prior to the end of the useful life of the First Generation satellites, and the ability of the Company to control certain disclosed problems in its existing constellation; the Offering Documents explained that all of these predicates needed to occur otherwise the Company's predictions could not come to fruition.

    For example, in one portion of the Prospectus cited in the CSAC (¶ 102), the Company discloses:

> *We expect* that our current satellite constellation will provide commercially viable service into 2010 and *plan* to deploy our second-generation satellite constellation beginning in 2009.  If *we are unable for any reason*, including manufacturing or launch delays, launch failures, delays in receiving regulatory approvals or insufficient funds, to deploy our second-generation constellation before our current constellation ceases to provide commercially viable service, we are likely to lose subscribers, and will incur a decline in revenues and profitability.

Prospectus at 16 (emphasis added).[7]  The Prospectus further cautioned that if, for *any reason*, including manufacturing delays, launch delays or failures, the Company was unable to deploy the second generation, the commercial consequences would be dire, including loss of subscribers, and a decline in revenues and profits.  See id.

As set forth in the Offering Documents, the Company's future predictions about the commercial viability of its existing satellite constellation were based upon internal monitoring of the health of the constellation to determine "out of family conditions" using frequent test calls (three minute calls every 10 minutes) over "control phones located at selected gateways" in clear line of sight to the sky to "pinpoint problems quickly if they occur on the system."  Id. at 89.  These predictions were also confirmed by results of a survey conducted by "an independent third party consultant" engaged by the Company to study "the health" of the Company's satellites.  Id.  That independent third party consultant issued an expert report which:

> confirmed that the constellation should provide a commercially acceptable quality of service into 2010, assuming the spare satellites are launched during 2007, *no major new anomalies are detected and those anomalies currently known are controlled satisfactorily*.  Id. (emphasis added).

The Offering Documents repeatedly and specifically identified the risks to the continued health and commercial viability of the existing satellite constellation.  Investors were therefore on notice of the very risks the Plaintiff now claims were not disclosed.  Accordingly, as a matter of law, the disclosures are not actionable under either Section 11 or Section 12 of the

---

[7]      Id. at 2 ("Our satellite constellation was launched in the late 1990s.  *We intend* to launch eight spare satellites in 2007 to supplement those currently in orbit.  *We believe* that, *as supplemented*, our constellation will continue to provide commercially acceptable service at least into 2010.") (emphasis added); 43 ("*Assuming* the successful launch of [eight] spare satellites, *we believe* our current satellite constellation will provide commercially acceptable quality of service into 2010.") (emphasis added); 88 ("*We believe* our in-space constellation will provide a commercially acceptable quality of service into 2010. . . .  *We plan* to place the eight satellites into a constellation configuration which seeks to optimize our service at that time.") (emphasis added).

Securities Act.  See Rombach v. Chang, 355 F.3d at 173 (holding that alleged misrepresentations in stock offering are "immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering"); P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004) (holding that no investors could complain that they were not warned that "bad things may come to pass – in dealing with the contingent or unforeseen future"); see also 17 C.F.R. § 230.175 (safe harbor for forward –looking statements).[8]  For example, the Offering Documents disclosed:

> Risks Relating to Our Business . . . Success of our business plan . . . will depend on:  our ability to maintain the health, capacity and control of our existing satellite network."  Prospectus at 13.

> * * *

> Our satellites have a limited life and may fail prematurely, which would cause our network to be compromised and materially and adversely affect our business, prospects and profitability.  Id. at 15.

In particular, the Offering Documents disclosed that since the deployment of the first generation of satellites in 1998, "nine have failed in orbit," and warned "others may fail in the future."  Id.  The Offering Documents detailed the various reasons that the existing satellite constellation might not be able to provide commercially viable service before their expected useful life, including:

> component failure, loss of power or fuel, inability to control positioning of the satellite, solar or other astronomical events, including solar radiation and flares, and space debris.  Id.

---

[8]      See Saslaw v. Askari, No. 95 Civ. 7641, 1997 WL 221208, at *9 (S.D.N.Y. Apr. 25, 1997) (Preska, J.) ("Any reasonable investor would have to conclude that [Company's] investment objectives could only be achieved if [their] hopes and predictions for the clothing market, upon which their marketing strategy was explicitly premised, came true."); Backhaus v. Streamedia Commc'ns, Inc., No. 01 Civ. 4889, 2002 U.S. Dist. LEXIS 14960 (S.D.N.Y. Aug. 14, 2002) (dismissing Section 11 claims because "[e]xamining the entire Prospectus in context, the Court finds that plaintiffs have failed to establish a prima facie case because the alleged misstatements are forward-looking and investment risks are disclosed in the Prospectus.").

The Offering Documents then identified three potential categories of technical problems or anomalies, including, (i) an electrical short in the communications S-band antenna that provides the forward link between the satellite and the user; (ii) degraded performance and potentially the eventual failure of the command receivers used for satellite command and control; and (iii) degraded performance over time of the solid-state power amplifiers of the S-band communications antenna. Specifically, the Offering Documents noted that "[e]ight of our nine satellite failures have been attributed to a common anomaly in the satellite communications subsystem S-band antenna." Id. The Offering Documents then disclosed that the S-Band anomaly "has occurred in 16 of our other satellites, a majority of which have been or are in the process of being returned to service." Id. Thus, even as of the time of the IPO, investors were well aware that the specific anomalies identified by the Prospectus were not just *theoretical possibilities* but actual problems that had already resulted in satellite failures and that these problems were continuing to appear in sixteen additional satellites which, if unabated, would result in "significant operational" difficulties for the Company.[9]

Collectively, these comprehensive and detailed disclosures wholly undercut Plaintiff's allegations that the Offering Documents misled investors in any way regarding the potential risk that the existing satellite constellation would fail to provide commercially viable service into 2010 or before the Second Generation of satellites could be deployed. Certainly, having disclosed the numerous risks to the continued commercial viability of its existing satellite constellation, the Company was not obligated then to take the dimmest view of its

---

[9] Besides these operational problems, the Offering Documents further disclosed that as the existing constellation "has aged, the quality of our satellites' signals has diminished and may continue to diminish, adversely affecting the reliability of our service, which could adversely affect our results of operations, cash flow and financial condition." Id.

future business prospects and its ability to overcome these challenges.  See Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").  Accordingly, where, as here, the alleged omissions have in fact been disclosed, the claim must fail as a matter of law.  See In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 377 (3d Cir. 1993).

Faced with the comprehensive disclosures in the Offering Documents, Plaintiff alleges that the Company and the Underwriter Defendants somehow already knew (as of the effective date of the Offering Documents) that the constellation would not be commercially viable until 2010 and that the Company would not be able to resolve the technical problems, notwithstanding that the February 2007 Form 8-K was based on additional "consultation with outside experts" and newly collected data.  CSAC ¶70.  To support this theory, Plaintiff appears to advance two arguments.  *First*, Plaintiff alleges that the Company somehow knew as of the effective date of the Offering Documents that its satellite constellation would not be commercially viable into 2010 because in a subsequent 10-K filing in April 2007 (for the year ending December 31, 2006) – some five months after the initial public offering – the Company disclosed that it had recalculated the depreciation of its existing satellite assets, and reduced the "estimated remaining lives" for the satellites from 39 months to 27 months due to the uncertainty about their remaining useful lives.  Id. ¶85.  This reduction would be "[e]ffective October 1, 2006."  Id.  From this "effective date," which was the start of the Company's fourth quarter, Plaintiff posits that the disclosure is "nothing less than an admission by Globalstar that problems with First Generation Satellites existed in the period when the IPO was consummated, which

rendered the statements" in the Offering Documents "materially false and misleading."  CSAC ¶ 90.  Plaintiff's suppositions are wrong.

The "problems" with the existing satellite constellation, such as the S-Band anomaly, were specifically disclosed in the Offering Documents.  In that regard, the so called "admission" in the annual report filing was hardly new.  Indeed, as outlined above, the Offering Documents even quantified the extent of the S-Band problem – noting that the anomaly had already rendered *sixteen* satellites temporarily inoperable and that steps were being taken to restore those satellites back to service.  Prospectus at 15.  What was new, and not known at the time of the initial public offering, was the fact that the degradation already described had gotten worse and that the Company was not able to successfully mitigate those issues, as it had previously anticipated.  A "lack of clairvoyance simply does not constitute securities fraud." Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995).  And the "effective date" is not a chronological fact, but driven by an accounting rule.[10]

*Second*, the CSAC alleges that in the February 2007 filing, the Company "acknowledges that by early 2006, Globalstar believed its satellite constellation would be commercially viable [until] the Second Generation Satellites were operable in 2009", not into 2010, the date described in the Offering Documents.  CSAC ¶ 107.  The February 2007 filing indicated that "[a]s reported in the Company's prior filings, in early 2006 the Company undertook a comprehensive third party review of this problem and the likely impact of the degradation of performance of these [S-Band] amplifiers in individual satellites on the

---

[10]     Under Statement of Financial Accounting Standards No. 154, a change in an accounting estimate, such as the change in the service life of a depreciable asset like a satellite, should be accounted for and reflected in the "period of change and future periods if the change affects both."  Thus, the Company's subsequent accounting recognition of the change in the service life of the existing satellites was effective on October 1, 2006, the first day of the Company's fourth quarter – the earliest reporting period prior to the February 2007 announcement.

performance of the constellation as a whole." Id. at ¶ 70.  The Form 8-K stated that at that time (in 2006), the Company concluded, based in part on the third party survey, that "although there was a risk, with the addition of the eight spare satellites in 2007, the constellation would continue to provide commercially viable two-way communications services" until the next generation of satellites could be deployed in 2009.  Id.

These reports are simply not inconsistent with the Offering Document disclosures.  As the latter set forth, the Company's independent consultant concluded that the constellation "should provide a commercially acceptable quality of service into 2010, assuming the spare satellites are launched during 2007, *no major new anomalies are detected and those anomalies currently known are controlled satisfactorily*."  Prospectus at 89 (emphasis added). The very disclosures about which Plaintiff complains actually put investors on notice that the success of the Company's future operations were contingent on the fact that there would be no major new anomalies afflicting their satellites and that the Company would be able to successfully manage existing anomalies.  Ultimately, the 8-K disclosed that the Company learned from recently collected operations data that the degradation of the S-Band amplifiers was occurring at a rate faster than previously experienced, despite the Company's best efforts to correct the problem, and that two-way communications services would likely cease before the Second Generation could be fully deployed, as planned.  The Offering Documents therefore clearly and precisely acknowledged the specific disclosure that Plaintiff now claims was omitted – that Globalstar's satellite constellation could become inoperative in the future prior to deployment of the replacement constellation.  As a result, "no investor could have believed" that the viability of the Company's satellite constellation would not be subject to grave operational difficulties and failures "unless that investor deliberately ignored explicit warnings,

and the securities laws were not meant to shelter those who deliberately disregard disclosed

risks." In re Hyperion Sec. Litig., No. 93 Civ. 7179, 1995 U.S. Dist. LEXIS 10020 (S.D.N.Y.

July 14, 1995) (Mukasey, J).

   Plaintiff next alleges that the Offering Documents misrepresented that the

Company had 43 in-orbit satellites, including in-orbit spares and satellites that were temporarily

out of service, but which the Company was attempting to restore to service," when, in fact, the

Company only had 37 satellites that "could carry traffic."  CSAC ¶ 108.  The CSAC also refers

to the Offering Documents' disclosure that the constellation currently orbits in a "40-satellite

configuration known as a 'Walker pattern.'" Id. ¶ 109.  In so doing, the CSAC relies on

unnamed and unidentified "confidential sources" who purportedly contend that as of *June 2006*,

the Company had "only had thirty-seven fully functioning satellites in orbit which were capable

of carrying satellite communication traffic.  Id. ¶ 110.  The CSAC does not provide any

identifying information about these sources, merely claiming they were "former Globalstar

employees, including a former employee engaged in monitoring Globalstar satellites." Id. ¶12.[11]

---

[11] Where, as here, plaintiffs can only support their allegations by relying on confidential
sources, the confidential witnesses must be "described in the complaint with sufficient
particularity to support the probability that a person in the position occupied by the source
would possess the information alleged." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000).
Relevant considerations may be "the level of detail provided by the confidential sources, the
corroborative nature of the other facts alleged (including from other sources), the coherence and
plausibility of the allegations, the number of sources, the reliability of the sources, and similar
indicia." In re Cabletron Sys., Inc., 311 F.3d 11, 29-30 (1st Cir. 2002).  Courts have eyed
unnamed confidential sources with appropriate skepticism.  For example, in Higginbotham v.
Baxter Int'l., Inc., the Seventh Circuit noted that "[i]t is hard to see how information from
anonymous sources could be deemed 'compelling' . . . .  Perhaps these confidential sources
have axes to grind.  Perhaps they are lying. Perhaps they don't even exist."  495 F.3d 753 (7th
Cir. 2007).
  Here, Plaintiff offered little identifying information about these confidential sources.
Although the CSAC claims that one of the sources "engaged in monitoring Globalstar
satellites," the CSAC does not assert that this former employee "monitored" any data about the
satellites that is *actually relevant to the plaintiff's allegations*.  Further, the CSAC does not state

Regardless of whether or not the Plaintiff's "confidential sources" may be credited in the assertion that in *June 2006* the Company had only 37 fully functioning satellites, that has no bearing on whether the Offering Documents were inaccurate – the IPO became effective five months later, and those documents made clear that, at any given point in time, identified anomalies were present in the satellites which resulted in the *temporary* failure of certain of those satellites while the Company attempted to restore those satellites back into service. Prospectus at 15. Further, the Offering Documents specifically disclosed that although there were a total of 43 in-orbit satellites, radiation-induced "failure of satellite components may result in damage to or loss of a satellite before the end of its expected life" and that as a result, "**fewer than 43** of our in-orbit satellites may be fully functioning at any time." Id. (emphasis added). At no time did the Offering Documents represent that all 43 in-orbit satellites were "fully functioning" and capable of "carrying traffic," as Plaintiff alleges. CSAC ¶ 108. Instead, they disclosed that the 43 in-orbit satellites were prone to service disruptions that caused them to be taken temporarily out of service. Prospectus at 87. As they further explained – in response to anomalies, which had already resulted in eight satellite failures and had been detected in sixteen additional satellites (rendering many of those satellites inoperable) – the Company had reduced the operating "constellation structure" from a "Walker 48" pattern to a "Walker 40" pattern, Id. at 15, 89, and that a "majority of Company's satellites" already had experienced other anomalies which "have not yet severely impacted services to customers but which may in the future limit the capacity of the existing network." Id. at 15. All of these cautious predictions

how long the employee worked at Globalstar (or whether she worked there at any time relevant to the allegations). As a result, the Plaintiff has provided the Court a limited basis to evaluate the confidential source's reliability. See In re Silicon Image, Inc. Sec. Litig., 2006 WL 1709424, at *2 (N.D. Cal. 2006) (dismissing claims purportedly supported by confidential sources where "[o]ther than describing [the sources] as 'former employees,' . . . plaintiffs provide no facts as to either such individual.").

about the number of operating in-orbit satellites and the multiple operational difficulties that were occurring with the majority of the satellites, eviscerate Plaintiff's categorical allegation that the Offering Documents somehow misrepresented that it had "43 fully functioning satellites." It did nothing of the sort.

C.   **Voice Quality Allegations**

The CSAC alleges generally that the Offering Documents misrepresented that the Company's voice quality over its existing satellite constellation was capable of retaining current customers.  CSAC ¶¶ 6(a), 9, 77-84, 91-95.   In doing so, the CSAC references a study performed by Frost & Sullivan, an independent consultant,[12] retained by Globalstar's competitor Iridium in December 2006, one month *after* the IPO, to compare the satellite services between the two companies.  CSAC ¶ 75.  Frost & Sullivan did not begin its study until late-January 2007, by then over two months after the IPO, and did not publish the results of its study until February 26, 2007 – approximately three weeks *after* Globalstar's issuance of its Form 8-K report on February 5, 2007, which disclosed significant new operational difficulties with its satellites.  Id. ¶ 76.  Frost & Sullivan "focused" on only one "Quality of Service" metric in comparing the services and based its results upon voice call completion and termination of voice calls.  Id. ¶ 78.  The February 2007 Frost & Sullivan report concluded that Iridium's average call success rate was 95% and Globalstar's call success rate was 34%.  Id. ¶ 77.[13]

---

[12]     The Offering Documents noted that in 2002, Frost & Sullivan had published a report that concluded that Globalstar's voice services provided "audio quality" that was superior to that of its principal voice mobile satellite services competitor and that the quality of the services "approach that of a good quality cellular call."  Prospectus at 76.

[13]     Plaintiff also must rely on its unnamed "confidential source" for the proposition that it was "readily apparent to Globalstar, based on the Company's internal monitoring of their satellite constellation," that the constellation could "not adequately support Globalstar's current subscriber base – let alone a growing subscriber base."  CSAC ¶ 95.  The CSAC provides no

The allegations fail to state a claim under either Section 11 or 12.  *First*, none of the of the representations made in the Offering Documents about "voice quality" were misleading.  The Offering Documents clearly disclosed the Company's belief that it could "retain our current customers and attract new customers" because of its "pricing plans and the *voice quality* of [its] network."  Prospectus at 3 (emphasis added).[14]  Plaintiff appears to conflate "voice quality" with "voice call completion and termination" rates – which are different metrics.  The "voice call completion and termination" ("call success") rate was the sole focus of the 2007 Frost & Sullivan report.  Thus, it is clear that the assessment performed by Frost & Sullivan in 2007 was focused on one metric and the representations made in the Offering Documents about "voice quality" were focused on another.[15]  Indeed, in 2002, when Globalstar commissioned Frost & Sullivan to perform its own study of the Company's satellite phone services, the ultimate

_____

details to explain why or how the "confidential source" would have first-hand access to relevant information that was current at the time of the IPO.  See n.9 supra.

[14]      See also Prospectus at 42 (noting that industry and Company's "[s]ubscriber base [has] been rapidly growing as a result of … improved *voice* and data transmission *quality*") (emphasis added); 76 ("*We believe* we are able to retain our current customers and attract new customers because of our pricing plans… and our voice services provide the *best audio quality* in our industry").

[15]      To be sure, the Offering Documents also stated that "[c]ompared to other satellite and network architectures, we offer superior call clarity, virtually no discernable delay and a low incidence of dropped calls.  The worldwide call success rate average for all of our users varies between 79% and 82%."  Prospectus at 88.  Plaintiff dismissed this statement as a "blatant misrepresentation" but does not dispute Globalstar's statement that it offered superior "call clarity" and offered no specific analysis as to why its historic statement that its worldwide average call success rate (as opposed to the timeframe of the 2007 Frost & Sullivan study) was misleading.  As courts have consistently held, accurate disclosure of historical performance is simply not a basis for liability based on the risk that future performance may deteriorate.  Zucker v. Quasha, 891 F. Supp. 1010, 1014  (D.N.J. 1995) (dismissing claim that company should have disclosed adverse trend in customer returns because adverse trend in current quarter did not render historical return rate false or misleading and company made no projections that were false or misleading); Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996) ("[T]he fact that a company has reported accurately about past successes does not by itself burden the company with a duty to inform the market that the present circumstances are less positive") (internal citation omitted).

report reviewed multiple aspects of "quality of service," including "call success" and "voice quality" of the calls actually completed, as evidenced by the report's conclusion that Globalstar satellite phones offered calls approaching the audio quality of a "good quality cellular call."  Id. at 76.  Plaintiff's attempt to conjure a misrepresentation, by equating voice quality with call success, should be rejected.

Second, Frost & Sullivan's study is not probative of the conditions and quality of service that existed as of the effective date of the Offering Documents – November 2006. Indeed, Frost & Sullivan did not even begin its comparative study until the end of January 2007; it could not have been evaluating the quality of service of Globalstar's constellation in November 2006.  By the timeframe of Frost & Sullivan's study, Globalstar had already disclosed in early February 2007 that its satellite constellation – with unexpected speed – had seriously deteriorated and the commercial viability of its two-way communications (i.e., voice services) was in jeopardy.  See CSAC ¶ 70.

Third, even if the statements about the "voice quality" of the Offering Documents could somehow be viewed as misrepresenting the ability of the existing satellite constellation to meet current and future subscriber demand, the Offering Documents again clearly and repeatedly warned investors that the Company's aging satellite constellation would continue to result in diminished signals, "adversely affecting the reliability" of services, which, as the Offering Documents went on to warn, could "adversely affect" the results of "operations, cash flow and financial condition."  Prospectus at 15; see also id. at 16 ("If we are unable to deploy our second-generation satellite constellation before our current satellite constellation ceases to provide commercially viable service, we will incur a decline in revenues and profitability.").  Finally, the Offering Documents specifically warned investors:

> We have been advised by our customers and others of temporary intermittent losses of signal cutting off calls in progress or preventing completions of calls when made.  If these problems increase, they could affect adversely our business and our ability to complete our business plan.  Id. at 15.

Under these circumstances, where the Offering Documents disclosed that the Company's own customers and others were reporting dropped calls due to signal loss and where the Offering Documents candidly warned that any increase in these problems would not only adversely hurt the business but compromise the ability of the Company to "complete [its] business plan" (id.), there can be no serious argument that a reasonable investor would have been misled in any material way about the risks of investing in the Company.  See Halperin, 295 F.3d at 359; Jackson v. Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994).

### D.      Subscriber Growth Allegations

The CSAC next alleges that the Offering Documents "falsely touted subscriber growth" and misrepresented that "growth" by failing to disclose that it was mainly due to increase in data customers and not more profitable voice customers.  CSAC ¶¶ 6(b), 54-59, 96-99.  This allegation is also baseless.

The Offering Documents provided total service revenues (see, e.g., Prospectus at 10) and also disclosed growth in the number of total subscribers (which included both voice and data subscribers):

> At June 30, 2006, we served approximately 236,500 subscribers.  We added approximately 54,000 and 41,000 net subscribers in the year ended December 31, 2005 and in the six months ended June 30, 2006, respectively.  We count "subscribers" based on the number of devices that are subject to agreements which entitle them to use our **voice or data communication services** rather than the number of persons or entities who own or lease those devices.   Id. at 1 (emphasis added).

* * *

21

> We believe the heightened demand for reliable communications services,
> particularly in the wake of the September 11, 2001 terrorist attacks, the
> December 2004 Asian tsunami…will continue to drive our strong growth
> in sales of both voice and data services.  Id. at 73; see also id. at 77.

Critically, there is no allegation that any of the subscriber figures or the revenues reported were misstated or inaccurate in any way.  Nor does Plaintiff dispute that the Company's subscriber base, in fact, was growing.  Rather, Plaintiff's primary quibble appears to be its preference that the Offering Documents break down the revenue for data and voice subscribers, which in Plaintiff's opinion, would have shown that the total subscriber growth figures increased "mainly due to the addition of Simplex and Duplex data communication subscribers and not the higher revenue-yielding voice subscribers."  CSAC ¶ 99.  Plaintiff's preferences do not and cannot render admittedly accurate subscriber growth figures "materially false and misleading." Cf. Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) ("This, however, does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'") (internal citation omitted). Moreover, the contention is belied by the Offering Documents' explicit acknowledgement that although "the majority of our subscribers utilize our network principally for voice communication services, **an increasing portion of our revenue is derived from the sale of high and low speed data services**."  Prospectus at 44 (emphasis added).  These specific and fulsome disclosures fundamentally undermine Plaintiff's unfounded claims.

## E.    Ancillary Terrestrial Component Allegations

Finally, the CSAC alleges that the Offering Documents misrepresented and omitted material facts regarding Globalstar's ability to provide ancillary terrestrial cellular ("ATC") phone services.  CSAC ¶¶ 111-13.  Specifically, Plaintiff alleges that the statements in

the Offering Documents that the Company's "current satellites and gateways are capable of supporting ATC services" and that the Company believed that this technical "capability will allow [it] to be among the first to introduce these services, potentially as soon as 2007," were "patently false" because Plaintiff asserts that, without any citation or authority, providing such services would have required a fully functioning constellation plus one in-orbit spare, which again based upon Plaintiff's unnamed confidential sources, the Company allegedly did not have at the time of the initial public offering.  CSAC ¶ 112. [16]  None of the allegations about the Offering Documents' disclosures concerning the Company's *potential* ATC capabilities were inaccurate or misleading.

There is no dispute that the Company was licensed by the Federal Communications Commission to provide ATC services with its "existing communications services."  Prospectus at 1.  Nor is there any apparent dispute, that unlike many of its competitors, the Company's existing constellation and ground stations "are *technically* capable of accommodating ATC operations."  Prospectus at 90 (emphasis added).  Thus, the primary issue is whether the Company's guarded belief that these capabilities would allow it to "be among the first to introduce these services, potentially as soon as 2007," given the state of its constellation system, was misleading on the effective date.  It was not.

The Company's cautiously optimistic belief that its technical capacity to provide ATC services would enable it to begin providing such services as early as 2007 was tempered by its specific cautionary explanation to investors that neither the Company nor "any other company has yet successfully integrated ATC services with satellite services" and its further candid

---

[16]      Here, again, the CSAC provides no details to explain why or how the "confidential source" would have first-hand access to specific and relevant information that was current *at the time of the IPO*.  See n.9 supra.

statement that "we may be unable to do so."  Prospectus at 13.  The Offering Documents then noted that if the Company should "fail to do so, we will not obtain the benefits described" in the Prospectus and any "investment we make in developing ATC services will be lost," and further cautioned that success of the Company's business plan, including, integration of ATC services, would depend on a number of specific operational factors, including, the Company's ability "to develop our second-generation satellites, and to upgrade our ground facilities consistent with various regulations" and "our ability to maintain the health, capacity and control of our existing satellite network, including the successful launch of  spare satellites.  Id.  Under similar facts where companies have specifically warned investors that products under development might never be commercially successful, courts have dismissed Securities Act claims when those companies ultimately were not successful.  See, e.g., In re OPUS360 Corp. Sec. Litig., Civ. A. No. 01-2938, 2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) (dismissing action where product and services discussed in prospectus were still subject to development and prospectus cautioned that they may never be commercially successful).  So, too, here.

### POINT III:  PLAINTIFF FAILED TO EFFECT SERVICE WITHIN THE PERIOD REQUIRED BY THIS COURT'S ORDER, FEDERAL RULE OF CIVIL PROCEDURE 4(M), AND THE STATUTE OF LIMITATIONS

None of the Underwriter Defendants has been served with process in this action as required by this Court's Case Management Order No. 1 (filed May 31, 2007) and Federal Rule of Civil Procedure 4(m).  This failure to effect service is further confirmed by Plaintiff's failure to file proof of service with the Court.  See Fed. R. Civ. P. 4(l).  Now that more one year has passed since the Company disclosed its revised projections about the lifespan of the First Generation satellites (which is apparently the source of all of the allegations against Underwriter Defendants that statements in the Offering Documents were in any way false and misleading

when made), Plaintiff has failed to effect service within the applicable statute of limitations period for claims brought under the Securities Act.  See 15 U.S.C. § 77m (Section 11 and 12 claims must be brought within "one year after the discovery of the untrue statement or the omission").  Because the Plaintiff has not, and cannot, establish good cause for its complete failure to effect (much less attempt) timely service, the CSAC should be dismissed with prejudice.[17]  See McKibben v. Credit Lyonnais, 1999 WL 604883, at *2 (S.D.N.Y. Aug. 10, 1999) (Preska, J.) (noting that dismissal is mandatory if defendant is not served within relevant time frame unless good cause or excusable neglect for delay shown).

## CONCLUSION

For the foregoing reasons, Plaintiff's claims against the Underwriter Defendants should be dismissed with prejudice.

Respectfully submitted,

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

By:  ___s/  Mitchell A. Lowenthal_____
          Mitchell A. Lowenthal

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
*Counsel for Underwriter Defendants*

Of Counsel:
     Victor L. Hou
     Timothy M. Haggerty

Dated: February 15, 2008

---

[17]     The Underwriter Defendants specifically adopt the arguments made by the Globalstar Defendants' Memorandum of Law, at III.C.