UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
LADMEN PARTNERS, INC.,                :   07 Civ. 0976 (LAP)
Individually and On Behalf of         :
Others Similarly Situated,            :        OPINION
                                      :
                   Plaintiff,         :
                                      :
         v.                           :   ┌─────────────────────────────┐
                                      :   │ USDC SDNY                   │
                                      :   │ DOCUMENT                    │
GLOBALSTAR, INC., JAMES MONROE         :   │ ELECTRONICALLY FILED        │
III, FUAD AHMAD, WACHOVIA CAPITAL     :   │ DOC #: _____        │
MARKETS, LLC, J.P. MORGAN             :   │ DATE FILED: 9/30/08         │
SECURITIES,INC., JEFFERIES &          :   └─────────────────────────────┘
COMPANY, INC.,                        :
                                      :
                   Defendants.        :
-----------------------------------x
LORETTA A. PRESKA, U.S.D.J.,

        Lead Plaintiff Connecticut Laborer's Pension Fund, on

behalf of a putative class of similarly situated investors,

filed this securities action alleging injury resulting from

material false and misleading statements made in connection with

the Initial Public Offering ("IPO") of defendant Globalstar,

Inc. ("Globalstar" or "the Company") in violation of Sections

11, 12(a)(2), and 15 of the Securities Act of 1933 (the

"Securities Act"), 15 U.S.C. §§ 77k, 77(a)(2), and 77(o),

respectively. Defendants James Monroe III and Fuad Ahmad

(collectively, the "Individual Defendants"), as well as Wachovia

Capital Markets, LLC, JP Morgan Securities, Inc., and Jefferies

and Company, Inc. (the "Underwriter Defendants"), and Globalstar

move to dismiss under Rules 4(m), 12(b)(5), 12(b)(6), and 9(b)of

1

the Federal Rules of Civil Procedure for failure to effect

proper service, failure to state a claim, and failure to plead

fraud with the requisite particularity. For the reasons

discussed below, the motions are DENIED insofar as they are

predicated on deficiencies in service of process and GRANTED on

the basis of Rules 9(b) and 12(b)(6).[1]

## BACKGROUND

### I. Factual Background

Globalstar is a publicly-owned provider of global telephone

and data communications using a network of in-orbit satellites

---

[1] In addition to the parties' notices of the instant motion and
Plaintiff's Consolidated Second Amended Complaint (the "CSAC"),
the Court has considered the following submissions in reaching
its decision: Defendants Globalstar, Inc., James Monroe III,
and Fuad Ahmad's Memorandum of Law in Support of Their Joint
Motion to Dismiss Plaintiff's Securities Class Action
Consolidated Second Amended Complaint ("Globalstar Mem.");
Declaration of William F. Adler, sworn to February 14, 2008
(Adler Decl.); Memorandum of Law of Wachovia Capital Markets,
LLC, J.P. Morgan Securities, Inc., and Jefferies & Company,
Inc., in Support of Their Motion to Dismiss the Consolidated
Second Amended Complaint ("Underwriter Mem."); Lead Plaintiff
Connecticut Laborers Pension Fund's Memorandum of Law in
Opposition to Defendants' Motion to Dismiss ("Pl. Mem.");
Declaration of Joel P. Laitman in Support of Lead Plaintiff
Connecticut Laborers Pension Fund's Memorandum of Law in
Opposition to Defendant's Motion to Dismiss, sworn to April 15,
2008 ("Laitman Decl."); Defendants Globalstar, Inc., James
Monroe III, and Fuad Ahmad's Reply Memorandum of Law in Support
of Their Joint Motion to Dismiss Plaintiff's Securities Class
Action Consolidated Second Amended Complaint ("Globalstar
Reply"); Reply Memorandum of Law of Wachovia Capital Markets,
LLC, J.P. Morgan Securities, Inc., and Jefferies & Company,
Inc., in Further Support of Their Motion to Dismiss the
Consolidated Second Amended Complaint ("Underwriter Reply"); and
other submissions included in the documents listed above.

and ground stations, or "gateways." (CSAC ¶¶ 2, 36 -37.)  The

Company's services include voice communication between fixed or

mobile handsets, two-way data transmissions (called "Duplex")

between data modems (used, for example, to provide high-speed

internet access), and one-way data communications (called

"Simplex") often used for tracking purposes. (See id. ¶ 36.)

Globalstar has endured a rocky financial history.  The

Company's predecessor, Globalstar L.P. ("Old Globalstar"), along

with three of its subsidiaries, filed for bankruptcy in February

of 2002. (Id. ¶ 37.)  The following year, Thermo Capital

Partners LLC ("Thermo"), of which Defendant Monroe is the

principal owner, acquired Old Globalstar's business and assets

and transferred them to Globalstar, LLC. (Id. ¶¶ 2, 37, 39.)

The Company took its current form when Globalstar, LLC was

incorporated in March, 2006. (Id.)  Upon incorporation, the

Globalstar's principal owners were Thermo, which held 81.25% of

its shares, and Old Globalstar's creditors, which held the

remaining 18.75%. (Id. ¶ 2 n.1.)

On November 3, 2006, Globalstar became a publicly held

corporation pursuant to the $127.5 million IPO of 7.5 million

shares at $17 per share. (Id. ¶¶ 1, 5.)  Approximately three

months later, on February 5, 2007, the Company issued an 8-K

filing and press release indicating that "data recently

collected from satellite operations" indicated that S-Band

3

antenna amplifiers on its satellites were deteriorating faster than anticipated. (Adler Decl. Ex. 2, (the "February 2007 8-K");[2] CSAC ¶ 70.) As a result, the Company expected that "by sometime in 2008 substantially all of the Company's currently in-orbit satellites will cease to be able to support two-way communications services." (Id.) Although the Company planned to launch eight spare satellites in mid-2007 and stated that "[s]ubscriber service will continue to be available", it warned that "increasingly large coverage gaps" would occur in the areas covered by its two-way communications network. (Id.) Not surprisingly, Globalstar's stock price plummeted, falling to $10.40 per share at the close of the following day. (CSAC ¶ 71.)

Plaintiff brought suit on behalf of a putative class of shareholders who bought Globalstar shares pursuant to the Company's IPO. (Id. ¶¶ 1, 30.) As detailed below, the claims stem from allegedly false or misleading statements made in the IPO offering Prospectus (Adler Decl. Ex. 1 (the "Prospectus")[3]), which was incorporated by reference into the Registration Statement filed with the Securities Exchange Commission ("SEC").

---

[2] As the February 2007 8-K is incorporated by reference in the CSAC, I have also considered the statements contained therein in resolving this motion. (CSAC ¶ 70) See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (Courts may consider "any statements or documents incorporated into [the complaint] by reference" when considering a motion to dismiss).

[3] The Prospectus is also incorporated by reference in the CSAC. (¶¶ 91-113.)

4

## II. Plaintiff's Allegations

The statements at issue in the CSAC are as follows.

## 1. Network Quality and Ability to Attract New Customers

Plaintiff points to various statements in the Prospectus

regarding the quality of the Globalstar Network, including:

> We believe we are able to retain our current customers
> and attract new customers because of our pricing plans
> and the voice quality of our network. We offer
> pricing plans with rates as low as $0.14 per minute.

(Prospectus, at 3; CSAC ¶ 91.)

> We believe our existing network is capable of handling
> the expected growth in demand for our services.

(Id.)

> We believe we are able to retain our current customers
> and attract new customers because our pricing plans,
> which offer rates as low as $0.14 per minute and our
> voice services provide the best audio quality in our
> industry. A report published by Frost & Sullivan in
> 2002 concluded that our voice services provide audio
> quality that is superior to that of our principal
> mobile satellite services competitor and approach that
> of a good quality cellular call. We believe the voice
> and data products that we expect to introduce in 2006
> and 2007 will be cheaper, lighter, and better
> performing than those previously available to mobile
> satellite services customers and will be equal to or
> better than those offered by our competitors. We
> believe our high quality and low cost services and
> products offer us a competitive advantage in retaining
> our current customers and attracting new customers in
> our vertical markets.

(Prospectus, at 76; CSAC ¶ 92.)

> Our constellation of low earth orbit satellites and
> terrestrial gateways has been in commercial operation
> since 2000 and serves as the backbone of our
> communications network. Gartner has described our

5

satellite constellation as "simple, yet proven
technology." We believe our existing network is
capable of handling the expected growth in demand for
our services, as evidenced by our ability to handle
increased usage of over 500% in the areas affected by
Hurricane Katrina while terrestrial communications
networks were impaired. We plan to supplement our
constellation by launching our eight spare satellites
during 2007.

(Id.)

Our satellite communications business, by providing
critical, reliable mobile communications to our
communications subscribers, serves principally the
following markets: government, public safety and
disaster relief; recreation and personal; maritime and
fishing; business, financial and insurance; natural
resources, mining and forestry; oil and gas;
consruction; utilities; and transportation. Both our
industry and our own subscriber base have been growing
rapidly as a result of

- favorable market reaction to our new pricing
  plans with lower service charges
- awareness of the need for remote and reliable
  communication services
- increased demand for reliable communication
  services by disaster and relief agencies and
  emergency first responders;
- improved voice and data transmission quality;
  and
- a general reduction in prices of user
  equipment.

(Prospectus, at 42; CSAC ¶ 93.)

Compared to other satellite and network architectures,
we offer superior call clarity, virtually no
discernable delay and a low incidence of dropped
calls. The worldwide call success rate average for
all of our users varies between 79% and 82%.

(Prospectus, at 88; CSAC ¶ 94.)

Plaintiff alleges that the above excerpts were materially

false and misleading because:

6

(1) Monitoring purportedly performed by teams of Globalstar satellite engineers and reported on a daily basis to senior management "had revealed an alarming decline" (CSAC ¶ 50) in the signal strength of the satellite constellation, such that it was "readily apparent" (id. at ¶ 95) that the Company could barely service its existing customers, much less additional ones.

(2) Internal reports of a Globalstar competitor, Iridium, Inc. ("Iridium") allegedly showed an increase in Globalstar's rate of dropped calls in the summer and fall of 2006. (Id. at ¶¶ 42, 60.) A subsequent study commissioned by Iridium and performed by Frost and Sullivan in late January of 2007 showed that Globalstar had a call success rate[4] of just 34%. (Id. at ¶¶ 77, 95.)

(3) An article published in Satellite Week, an industry publication, on October 16, 2006 stated that "as Globalstar satellites age, 'nearly all have begun or will begin to exhibit a modest degree of reduced call capacity due to S-band antenna amplifiers.'" (Id. at ¶ 4.)

## 2. Commercial Viability Through 2010

The CSAC alleges that the Prospectus misrepresented the expected life of Globalstar's satellite network. Globalstar

---

[4] Call success rate, as defined by the Frost and Sullivan study, is the percentage of calls attempted during the test that remained successfully connected over a period of three minutes. (Adler Decl. Ex. 3, at 3, 5.)

7

planned to use the proceeds of the IPO, along with future

revenues, to help pay for a new generation of satellites (the

"Second Generation Constellation") to be launched in 2009 (at a

cost of between $1.0 and 1.2 billion). (Id. at 7; Prospectus, at

7). According the CSAC, "[s]ince it was essential to the

business plan presented by Globalstar that here [sic] be no gap

between current operations of the First Generation Satellites

and operations of the Second Generation Constellation,

Defendants repeatedly advised investors that the satellites

would provide 'commercially viable' and 'commercially

acceptable' service to customers 'into 2010.'" (CSAC ¶ 100).

Plaintiff cites the following statements from the Prospectus in

support of this allegation:

> Our satellite constellation was launched in the late
> 1990s. We intend to launch eight spare satellites in
> 2007 to supplement those currently in orbit. We
> believe that, as supplemented, our constellation will
> continue to provide commercially acceptable service at
> least into 2010.

> We are currently in the process of designing and
> procuring our second-generation satellite
> constellation, which we expect to deploy beginning in
> 2009 to extend the life of our network until
> approximately 2015.

(Prospectus, at 2; CSAC ¶ 101.)

> We expect that our current satellite constellation
> will provide commercially viable service into 2010 and
> plan to deploy our second-generation satellite
> constellation beginning in 2009. If we are unable for
> any reason, including manufacturing or launch delays,
> launch failures, delays in receiving regulatory

8

approvals or insufficient funds, to deploy our second-generation constellation before our current constellation ceases to provide commercially viable service we are likely to lose subscribers, and will incur a deadline in revenues and profitability as our ability to provide commercially viable service declines.

(Prospectus, at 16; CSAC ¶ 102.)

Our current satellite constellation was launched from 1998 to 2000. We plan to launch our eight spare satellites in 2007. Assuming the successful launch of these spare satellites, we believe our current satellite constellation will provide a commercially acceptable quality of service into 2010.

(Prospectus, at 43; CSAC ¶ 103.)

Depreciation is provided using the straight line-method over the estimated lives [of the satellites]. For this purpose, we have estimated that our satellites have an estimated useful life of 10 years from commencement of service, or through December 31, 2009."

(Prospectus, at 49; CSAC ¶ 104.)

We believe our in-space constellation will provide a commercially acceptable quality of service into 2010. We have eight spare satellites which are being prepared for launch during 2007 to augment our constellation. We plan to place the eight satellites into a constellation configuration which seeks to optimize our service at that time. We have entered into a launch service agreement with Starsem for two launches, with the launches of the spare satellites scheduled for March and May, 2007.

(Prospectus, at 88; CSAC ¶ 105.)

We monitor the health of our satellites for quick identification of "out-of-family" conditions. Our control phones located at selected gateways, which are placed in clear line of sight to the sky, make three-minute calls every 10 minutes and are used to recognize and pinpoint problems quickly if they occur

9

on the system. These phones have a call success rate
of over 98%. We recently hired an independent third
party consultant to conduct a survey on the health of
our satellites. The report confirmed that the
constellation should provide a commercially acceptable
quality of service into 2010, assuming the spare
satellites are launched during 2007, no major new
anomalies are detected and those anomalies currently
known are controlled satisfactorily.

(Prospectus, at 89; CSAC ¶ 106.)

The CSAC advances three arguments to support the allegation

that "Globalstar misrepresented" (CSAC ¶106) the health of its

existing satellite constellation with the above statements:

(1) The statements conflicted with the internal monitoring

reports discussed, supra, which revealed satellite degradation

over the summer and fall of 2006. (CSAC ¶ 50-53, 106.)

Furthermore, Plaintiff alleges that the satellite life-

expectancy projections, or "plots", derived from these internal

reports "revealed that the constellation would cease all

commercial viability in 2008," before the Second Generation

Constellation was to be launched. (Id. ¶ 51.)

(2) Globalstar's Form 10-K for the year ending December

31, 2006, (the "2006 10-K"), filed on April 2, 2007, stated that

"Effective October 1, 2006," the Company reduced its accounting

estimate of the expected life of its first-generation satellites

from 39 months to 27 months, meaning that the Company did not

expect the satellites to remain viable into 2010 (Id. ¶¶ 85).

Plaintiff contends that the 10-K's statement that this

10

accounting change was "effective" in October 2006 admits that the Company knew at that time that its satellite fleet would not last as long as the Prospectus indicated. (Id. ¶¶ 85-90, 107.)

(3) The February 2007 8-K, the disclosures from which precipitated Globalstar's drop in stock price, referred to a third party review of the problem of degradation of the satellites' S-band amplifiers which had begun in 2006. (Id. ¶¶ 70, 107.) Plaintiff contends that the 8-K therefore "acknowledges" that Globalstar knew of the rapid deterioration of the S-band antenna "by early 2006." (Id. ¶ 107.)

3. Number of Functioning Satellites

Plaintiff also alleges that "Globalstar misrepresented" its number of "commercially viable" satellites at the time of the IPO by including the following statement in the Prospectus:

Our satellite network includes 43 in-orbit low earth orbit satellites, including in-orbit spares temporarily placed into service and satellites that are temporarily out of service but are considered restorable. The design of our orbital planes and the positioning of our ground stations ensure that generally at least two satellites, and often more, are visible to subscribers from any point on the earth's surface between 70° north latitude and 90° south latitude, covering most of the world's population. All of our satellites are virtually identical in design and manufacture, and each satellite contributes equally to the constellation performance, which allows satellite diversity for mitigation of service gaps from individual satellite outages. Our constellation currently orbits in a 40-satellite configuration known as a "Walker pattern" orbital geometry. Each satellite has a high degree of on-board subsystem redundancy, an on-board fault detection system and

11

isolation and recovery for safe and quick risk mitigation. Our ability to reconfigure the orbital location of each satellite provides us with operating flexibility and continuity of service. The design of our space and ground control system facilitates the real time intervention and management of the satellite constellation and service upgrades via hardware and software enhancements.

(Prospectus, at 87; CSAC ¶ 109.)

The CSAC alleges that the above statement was materially misleading because "according to confidential sources" Globalstar had only thirty-seven, not forty three, "fully functioning satellites in orbit which were capable of carrying satellite communication traffic" at the time of the IPO.(CSAC ¶ 113.)

4.    Ancillary Terrestrial Component ("ATC") Services

Plaintiff also asserts that Prospectus contains "patently false and materially misleading" statements with respect to Globalstar's ability to provide ATC[5] services. (CSAC ¶ 113.) The CSAC highlights the following excerpt:

Our current satellites and gateways are capable of supporting ATC services and, therefore, in combination with a terrestrial network, we will be able to provide services where satellite services generally do not function, such as urban areas and inside buildings. We believe this capability will allow us to be among

---

[5] ATC networks are hybrids that incorporate both satellite and terrestrial wireless phone networks, enabling users to utilize both the higher-bandwidth terrestrial networks when available and the satellite networks when in remote areas. (CSAC ¶ 111; Prospectus, at 90.)

12

the first to introduce these services, potentially as
soon as 2007.

(Prospectus, at 3; CSAC ¶ 112.)

According to the CSAC, the above statements are actionable
because, while Globalstar was licensed to provide ATC service,
it cannot "currently" satisfy those licensing requirements
because it does not have enough fully functioning satellites.
(CSAC ¶ 113.) Additionally, the CSAC alleges that Globalstar
was unlikely to "be among the first" to provide ATC services
because other competitors have thus far been unable to provide
them. (Id.)

5. Subscriber and Sales Growth

Lastly, Plaintiff challenges the following excerpts from
the Prospectus with respect to Globalstar's subscriber growth:

> At June 30, 2006, we served approximately 236,500
> subscribers. We added approximately 54,000 and 41,000
> net subscribers in the year ended December 31, 2005
> and in the six months ended June 30, 2006,
> respectively. We count "subscribers" based on the
> number of devices that are subject to agreements which
> entitle them to use our voice or data communication
> services rather than the number of persons or entities
> who own or lease those devices.

(Prospectus, at 1; CSAC ¶ 96.)

> At June 30, 2006, we served approximately 236,500
> subscribers, which represented a 50% increase since
> June 30, 2005. We believe the heightened demand for
> reliable communications services, particularly in the
> wake of the September 11, 2001 terrorist attacks, the
> December 2004 Asian tsunami and the U.S. Gulf Coast
> hurricane activity in 2004 and 2005, will continue to

13

drive our strong growth in sales of both voice and
data services. . .

(Prospectus, at 73; CSAC ¶ 97.)

In 2005, we added approximately 54,000 net
subscribers, a 39% growth rate over the number of
subscribers at the end of 2004. We intend to continue
to increase our penetration of the growing mobile
satellite services market and our market share of key
vertical markets by continuing to provide compelling
service and product offerings and utilizing our strong
distribution network.

(Prospectus, at 77; CSAC ¶ 98.)

Plaintiff does not contend that the above-listed numbers
are false, but rather that they are misleading because they
describe the total subscriber base rather than its specific
components. (CSAC ¶ 99). According to Plaintiff, Globalstar
generated more revenue from voice subscribers than Duplex data
subscribers or Simplex subscribers. (Id. ¶¶ 54, 99.) It alleges
that that degradation of Globalstar satellites did not affect
data subscribers, whose subscribership base was actually
growing, but adversely affected voice subscriptions during the
first nine months of 2006. (Id. at ¶ 58, 99.) Therefore,
reporting the growing total subscribership rather than
specifically voice, as opposed to data subscriptions,
mischaracterized the Company's financial prospects. (Id.
¶¶ 58-59, 99.)

## III. Procedural History

On February 9, 2007, the first of three class action complaints was filed against Globalstar and the Individual Defendants. (Docket Nos. 1, 17.) The cases were consolidated on May 10, 2007, and the first consolidated amended complaint (the "FCAC") was filed against all Defendants in the instant action on August 15, 2007. (Docket No. 27.) Pursuant to a Stipulation and Order entered November 6, 2007 (Docket No. 30), Plaintiff filed the CSAC on November 15, 2007.

Plaintiff contends that, by virtue of the Prospectus statements described above, the Individual Defendants are liable under Sections 11, 12(a)(2), and 15 of the Securities Act and that Globalstar and the Underwriter Defendants are liable under Sections 11 and 12(a)(2).

## DISCUSSION

### I. Defendants' Motions to Dismiss under Rule 4(m)

Defendants first seek dismissal under Rule 4(m) of the Federal Rules of Civil Procedure for deficient service of process.[6] Under Rule 4(m), the Court "must dismiss" without prejudice a complaint that is not served on a defendant within 120 days of filing, unless it finds good cause for the delay.

---

[6] Globalstar and the Individual Defendants cite Federal Rule of Civil Procedure 12(b)(5), which states that parties may move to dismiss for "insufficient service of process." (Docket No. 42.)

15

A defendant may, however, waive service of process by his conduct. See, e.g., Datskow v. Teledyne, Inc., 899 F.2d 1298, 1303 (2d Cir. 1990); Allied Semi-Conductors Int'l Ltd., 907 F. Supp. 618, 623 (E.D.N.Y. 1995); Altman v. Comm'r of Internal Revenue, 1992 U.S. Dist. LEXIS 21330,at *13 (S.D.N.Y. 1992). The Court of Appeals has further held that district courts have discretion to extend Rule 4(m)'s 120-day service deadline even absent a showing of good cause, particularly where a combination of dismissal and the statute of limitations would effectively result in a dismissal with prejudice. Zapata v. The City of New York, 502 F.3d 192, 196-97 (2d Cir. 2007).

Globalstar and the Individual Defendants do not deny that they received actual notice of the instant action. Rather, they argue that service was deficient because they were never formally served with a complaint. (Globalstar Mem., at 7-8.)[7] Furthermore, because the statute of limitations on Plaintiff's claims had expired less than two weeks before Globalstar and the Individual Defendants filed their motion to dismiss, they contend that the CSAC should be dismissed with prejudice. (Globalstar Mem., at 8.)

---

[7] On a motion to dismiss for lack of personal jurisdiction, the Court may consider all pertinent submissions by the parties whether or not they are included in the pleadings. See C.B.C. Wood Prods., Inc. v. LMD Integrated Logistics Servs., 455 F.Supp.2d 218, 221 (E.D.N.Y. 2006).

16

The motion to dismiss on this basis is denied. Globalstar and the Individual Defendants rely heavily on this Court's May 29, 2008 Case Management Order Number 1, (the "CMO") which specifically directed Plaintiff to file the FCAC by August 15, 2007 and effect service thereof "pursuant to Rule 4(d)" (Docket No. 18.; see also Globalstar Mem., at 7). This exact language was in the proposed Case Management Order which the parties jointly submitted to the Court. (See Laitman Decl. Ex. 1; Docket No. 18.) Rule 4(d), entitled "Waiving Service", provides a mechanism by which a plaintiff can, with the consent of the defendant, forego the expense of effecting formal service. There is no dispute that Plaintiff both timely filed the FCAC with the Court and hand-delivered a hardcopy to counsel for Globalstar and the Individual Defendants on the filing date. (Laitman Decl. ¶ 9; Globalstar Reply, at 14.) Given the germination and phrasing of the CMO, it is no wonder Plaintiff thought nothing more was required.

Furthermore, the parties subsequently discussed the perceived deficiencies in the FCAC, (Laitman Decl. ¶¶ 10-12), exchanged documents (id. ¶¶ 14-15), attended settlement negotiations (id. ¶¶ 13, 16), and stipulated to the November 15, 2008 filing of the CSAC (Docket No. 30), which Plaintiff sent via hand-delivery to all parties (id. ¶ 21). While each of these subsequent communications, standing alone, would normally

17

be insufficient to excuse formal service, see Kim v. Bonan, 2005
WL 1105245, at *3 (E.D.N.Y. May 10, 2005)(defense counsel's
request for a courtesy copy of complaint did not effect a waiver
of service), I find that Globalstar and the Individual
Defendants waived such service by approving the submission of a
CMO keyed to the waiver provisions of the Federal Rules and
engaging in the litigation activities described above. Cf.
Altman, 1992 LEXIS 21330, at *12 ("waiver may be found even if
the actions of the defendant or his attorney were not intended
to effect a waiver.")

Although it presents a closer question, the Underwriter
Defendants' motion to dismiss for deficient service of process
is also denied. Unlike Globalstar and the Individual
Defendants, the Underwriter Defendants first became parties to
this action when they were named in the FCAC and did not
participate in drafting the CMO. (Laitman Decl. ¶ 8.) Upon
filing, pursuant to the CMO and Rule 4(d), Plaintiff sent a copy
of the FSAC, a notice of lawsuit, and a waiver of service of
summons form to the legal departments of each Underwriter
Defendant. (Id. ¶ 9, Ex. 4.) None of the waiver of service
forms was returned to Plaintiff. (Id.) Counsel for the
Underwriter Defendants subsequently stipulated to the filing of
the CSAC, (Docket No. 30), filed a notice of appearance, (Docket
No. 31), and engaged in multiple discussions with Plaintiff's

counsel (Laitman Decl. ¶¶ 17-18, 24). Plaintiff's counsel sent hard copies of the CSAC to counsel for the Underwriter Defendants, which was filed on the day specified in the parties' stipulation. (Laitman Decl. ¶ 21, Ex. 12; Docket No. 30).

Whether the above-described behavior was enough to constitute waiver is a thorny question. The Underwriter Defendants correctly contend that they cannot have waived service merely by refusing to return the waiver form sent by Plaintiff, which expressly provided that if it were not returned, Plaintiff would effect formal service. (Laitman Decl. Ex. 4; Underwriter Reply, at 13.) If this conduct were sufficient to constitute waiver, then service would always be deemed waived upon *request* rather than acquiescence. Furthermore, unlike Globalstar and the Individual Defendants, the Underwriter Defendants did not exchange documents or attend face-to-face settlement conferences with Plaintiff's counsel. (See Pl. Mem. 49-50.)

It is likewise difficult to conclude that Plaintiff has shown good cause, within the meaning of Rule 4(m), for failing formally to serve the Underwriter Defendants. On the one hand, Plaintiff relied on the CMO (to which the Underwriter Defendants were not subject until they were made parties to the action), which specifically provided that service was to be completed pursuant to the waiver provisions of the Federal Rules of Civil

Procedure. (Docket No. 18.) On the other, Plaintiff should have

known that the Underwriter Defendants had not responded to the

waiver request and acted accordingly. See McKibben v. Credit

Lyonnais, No. 98 Civ. 3358, 1999 WL 604883 (S.D.N.Y. Aug3 10,

1999), at *2 ("it is well settled that an attorney's

inadvertence, neglect, mistake or misplaced reliance does not

suffice to establish good cause for failure to make proper

service within 120 days.")

I need not resolve these questions here because I find

that, under the unique circumstances of this case, equitable

factors warrant excusal of improper service. See Zapata, 502

F.3d at 196 ("district courts have discretion to grant

extensions even in the absence of good cause."); Almonord v.

Kingsbrook Jewish Med. Ctr., 2007 U.S. Dist. LEXIS 58529, at

*40-42 (E.D.N.Y. August 10, 2007); (denying motion to dismiss

for defective service where no good cause was shown but

equitable considerations precluded dismissal); Bender v. Gen.

Servs. Admin., 2008 U.S. Dist. LEXIS 17280, at *705 (S.D.N.Y.

March 5, 2008) (same). In determining whether to excuse

imperfect service, Courts have considered whether (1) the

statute of limitations would preclude reinitiating the action,

(2) the defendant had actual notice of the complaint, (3) the

defendant tried to hide the defect in service, and (4) the

defendant would be prejudiced by excusal. Hollomon v. City of

New York, 2006 U.S. Dist. LEXIS 52424, at *11 (E.D.N.Y. July 31,

2006) (citing Eastern Refectories Co. v. Forty Eight

Insulations, Inc., 187 F.R.D. 503, 506 (S.D.N.Y. 1999). Here,

the statute of limitations expired less than two weeks before

the Underwriter Defendants moved to dismiss, they plainly

received notice of the action, and they would suffer no

prejudice from excusal because they have already thoroughly

briefed the merits of Plaintiff's contentions. Finally, while

they may not have concealed the defective service, it has not

escaped my attention that the Underwriter Defendants waited

until after the statute of limitations had expired before moving

to dismiss pursuant to Rule 4(m). Cf. Zankel v. U.S., 921 F.2d

432, 438 (2d Cir. 1990) (While not legally obligated to move to

dismiss within the 120-day service period, defendant arguably

"lulled" Plaintiff into inactivity failing to advise them of

defective service before that statute of limitations had run.)

Accordingly, the Underwriter Defendants' motion to dismiss due

to deficient service of process is denied.

II.  Defendants' Motions to Dismiss under Rules 9(b) and

12(b)(6)

A.  Legal Standards

i.  12(b)(6) Motion

    On a motion to dismiss for failure to state a claim, the

court must accept the allegations in the complaint as true and

draw all reasonable inferences in favor of the plaintiff. See
Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d
Cir. 2001). However, to withstand such a motion, "[f]actual
allegations must be enough to raise a right to relief above the
speculative level." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955,
1969 (2007). The Court may consider all documents attached to
or incorporated by reference in the complaint, documents
Plaintiff possessed or knew of when bringing suit, and matters
of which judicial notice may be taken. Chambers v. Time Warner,
Inc., 282 F.3d 147, 153 (2d Cir. 2002).

ii. Section 11

Section 11 "was designed to assure compliance with the
disclosure provisions of [the Securities Act] by imposing a
stringent standard of liability on the parties who play a direct
role in a registered offering." Herman & MacLean v. Huddleston,
459 U.S. 375, 381-82 (1983). To state a claim, Plaintiff must
allege that "part of the registration statement, when such part
became effective, contained an untrue statement of material fact
or omitted to state a material fact required to make the
statements therein not misleading."[8] 15 U.S.C. §77k(a). In
pertinent part, Section 11 liability may reach signatories of

---

[8] Here, there is no dispute that the Prospectus qualifies as a
Registration Statement for purposes of Section 11 because it was
incorporated by reference into the Registration filed with the
SEC. (Prospectus, at 115.)

22

the registration statement at issue, directors of the issuer, and underwriters. Id. The veracity of a registration statement which may give rise to liability under this provision is determined by assessing the facts as they existed when the statement became effective. See In Re Public Offering Secs. Litig., 358 F.Supp.2d 189, 205 (S.D.N.Y. 2004) (citing In re MobileMedia Secs. Litig., 28 F.Supp.2d 901, 923 (D.N.J. 1998).

iii. Section 12(a)(2)

Section 12(a)(2) provides a civil remedy for purchasers of a security sold "by means of a prospectus or oral communication" containing "an untrue statement of material fact" or material omission. 15 U.S.C. §77l(a)(2). Liability attaches to direct sellers as well as those who "successfully solicited the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." Pinter v. Dahl, 486 U.S. 622, 647 (1988).

iv. Section 15

This provision extends liability to "every person who . . . controls any person liable" under Sections 11 or 12 of the Exchange Act. 15 U.S.C. §77o. In order to state a Section 15 claim, a plaintiff must adequately allege "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the

primary violation." In re Prestige Brands Holdings, Inc. Sec.

Litig., 2006 U.S. Dist. LEXIS 81980, *6-7 (S.D.N.Y. November 9,

2006) (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.

1998).

v.   The proper pleading standard

Defendants assert that the heightened pleading requirements

of Federal Rule of Civil Procedure 9(b) apply to Plaintiff's

Section 11 and 12(a)(2) claims because they are "classic fraud"

allegations. (Globalstar Mem., at 10; Underwriter Mem., at 7

n.6; Underwriter Reply, at 3.)  Under Rule 9(b), a party must

"state with particularity the circumstances" supporting an

allegation of fraud.  Where applicable, the Rule requires that a

complaint "(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the

statements were fraudulent."[9] Acito v. IMCERA Group, Inc., 47

F.3d 47, 51 (2d Cir. 1995) (quoting Mills v. Polar Molecular

Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

Although fraud is not an element of a Section 11 or Section

12(a)(2) claim, our Court of Appeals has held that "the

---

[9] The PSLRA, which similarly provides that a "complaint shall
state with particularity all facts" on which an allegation of
securities fraud relies, is inapplicable here because it applies
only to claims brought under the Exchange Act. 15 U.S.C. §78u-
4(b)(1); see also Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.
2004).

24

heightened pleading standard of Rule 9(b)" applies to such

claims where a complaint is "premised on allegations of fraud."

Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).

Additionally, a complaint may sound in fraud even where, as

here, no fraud claims under the Exchange Act are asserted. See

In re Leadis Tech., No. C-05-00882 CDB, 2006 WL 496039, at *3-5

(N.D. Cal. March 1, 2006)(applying Rule 9(b) where only Section

11 and 12(a)(2) claims were asserted but plaintiffs' complaint

was nonetheless predicated on a theory of fraudulent conduct);

In re CIT Group, Inc. Secs. Litig., 349 F.Supp.2d 685, 690 n.4

(S.D.N.Y. 2004) (noting applicability of heightened pleading

standards to a Section 11 claim even absent an Exchange Act

claim where the allegation nonetheless sounds in fraud). The

ultimate question is whether, at its core, the complaint is

predicated on allegations of fraudulent conduct. See Rombach,

355 F.3d 164, at 171 (noting that the wording of Rule 9(b) "is

cast in terms of the conduct alleged, and is not limited to

allegations styled or denominated as fraud"). The Court must

therefore closely scrutinize the pleadings to determine whether

Plaintiff's Section 11 and 12(a)(2) claims "sound in negligence

or in fraud." Id.; see also In re Refco, Inc. Secs. Litig., 503

F.Supp. 2d 611, 631 ("Rombach necessarily requires a case-by-

case analysis of particular pleadings to determine whether 'the

gravamen of the complaint is plainly fraud.'")(quoting In re

Stac Elecs. Secs. Litig., 89 F.3d 1399, 1405 n.2 (9th Cir.
1996).

With regard to Globalstar, the CSAC is riddled with
allegations of essentially fraudulent conduct. Plaintiff
basically asserts that not only did Globalstar have actual
knowledge of the degradation of its satellite constellation
prior to the IPO, but it deliberately withheld that information
from investors because it needed money from the IPO to finance a
new generation of satellites. The CSAC alleges that, because of
internal monitoring, the Company knew that its first generation
of satellites was rapidly deteriorating. (CSAC ¶¶ 50-53, 95,
107; see also Pl. Mem., at 17 ("Globalstar *had to know* of the
problems prior to year end and prior to the IPO.")(emphasis
added)). The Company was therefore "in dire need of a massive
cash infusion in order to successfully manufacture and launch
their Second Generation Satellite Constellation" (CSAC ¶ 62), so
it "sought to dispel any investor concern about the current
functioning and commercial viability" of its satellite fleet to
maximize the sale of its stock (id. ¶ 4). Thus, Globalstar gave
a "blatant misrepresentation" of the voice quality of its
network (id. ¶ 94), "repeatedly advised" investors that its
satellites would remain viable until the Second Generation was
launched (id. ¶ 100), "misrepresented subscriber growth" (id.
¶ 98) to "promote the underlying strength of its operations"

(id. ¶ 96), made "patently false" statements to mislead investors into thinking it could provide ATC services (id. ¶ 113), and, despite knowing that it had "at most" thirty-seven "fully-functioning" satellites, falsely reported that its network included forty-three satellites (id. ¶ 110). These are classic allegations of fraud and must be pled with particularity.[10] See, e.g. Leadis, 2006 WL 496039, at *4 (allegations that defendants knew of decreased sale at the time of an IPO and failed to disclose that information in the corresponding Prospectus constituted "a quintessential fraud claim."); In re Ultrafem Inc. Secs. Litig., 91 F.Supp.2d 678, 691 (S.D.N.Y. 2000)(finding that section 11 and 12(a)(2) claims alleging "misrepresentations and omissions made with intent to defraud upon which plaintiffs relied" sound in fraud.)

The claims with respect to the Individual Defendants are also subject to Rule 9(b)'s heightened pleading standard. The CSAC asserts that internal monitoring showed that Globalstar's

---

[10] Plaintiffs argue that the CSAC disclaimers in paragraphs 116, 125, and 134 of the CSAC, which state that each of the asserted claims "does not sound in fraud" show that they have pled only negligence on the part of all defendants. (Pl. Mem., at 11-12.) This contention is without merit. It is well established that in this context a "boilerplate disclaimer is not enough to make out a claim for negligence." In re Ultrafem, Inc. Secs. Litig., 91 F.Supp.2d 678, 691; see also Rombach, 355 F.3d 164, at 172 (plaintiffs' bald assertion that their Section 11 claims "do [] not sound in fraud" are not enough to avoid application of Rule 9(b) where "the wording and imputations of the complaint are classically associated with fraud").

satellites were deteriorating at a rapid rate and summaries of
this information were "reported directly to Monroe and Ahmad."
(CSAC ¶ 26, see also ¶ 50). Despite the fact that "the
Individual Directors saw the adverse effects of Globalstar's
deteriorating satellites" (id. ¶ 26), they were nonetheless
"involved in drafting, producing, reviewing and/or disseminating
the misleading statements and information" at issue (id.
¶ 27). While the CSAC also includes allegations couched in
terms of negligence,[11] the underlying theory regarding the
Individual Defendants is the same as it is with respect to
Globalstar, namely that they *knew* that the Company's satellites
were failing and participated in an essentially fraudulent
scheme to deceive investors about the true status of its assets.
See Rombach, 355 F.3d 164, 171-72 (appropriate focus is on
underlying conduct); Leadis, 2006 WL 496039, at *4 (applying
Rule 9(b) where the "true factual basis" for the claims at issue
was the allegation that the defendants knew their statements
were false).

As with the service issue discussed supra, the more
difficult question relates to the Underwriter Defendants.

[11] See CSAC ¶ 121, "The Individual Defendants . . . did not make
a reasonable investigation and did not possess reasonable
grounds for believing that the statements contained in the
registration statements were true", ¶ 28, "The Individual
Defendants . . . each had a duty to promptly disseminate
accurate and truthful information with respect to Globalstar",
¶ 136 (same).

Allegations that underwriters failed to conduct reasonable due diligence generally sound in negligence and are analyzed under the more liberal pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure. See Rombach, 355 F.3d 164 at 178 (applying negligence standard to claim that underwriters failed to conduct reasonable due diligence), Ultrafem, 91 F.Supp.2d 678 at 691 (same); see also In re Atlas Worldwide Holdings, Inc. Secs. Litig., 324 F.Supp.2d 474, 502 (S.D.N.Y. 2007) (allegation that underwriter "failed to conduct a reasonable investigation" and thus lacked reasonable grounds for believing the contested statements were not misleading did not sound in fraud).

Here, however, while the CSAC includes allegations that the Underwriter Defendants conducted deficient due diligence, (CSAC ¶ 120),[12] the allegations are inextricably interwoven with suggestions that they deliberately turned a blind eye to known deficiencies in Globalstar's satellite network. Thus, "the Underwriters performed a deficient due diligence review . . . because, inter alia, they *ignored specific and readily apparent red flags* indicating that the degradation and deterioration of Globalstar satellites was far more significant than that which was disclosed." (Id. ¶ 25(emphasis added); see also ¶ 4.)

---

[12] "[T]he Underwriter Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the registration statement were true, did not omit any material fact, and was not materially misleading."

29

Furthermore, in a number of allegations of essentially fraudulent conduct, the CSAC makes no effort whatsoever to distinguish the Underwriter Defendants from Globalstar and the Individual Defendants. (See, e.g., CSAC ¶¶ 97 ("Defendants reiterated this misrepresentation throughout the prospectus"), 98 ("Defendants misrepresented subscriber growth yet again"), 100 ("Since it was essential to the business plan presented by GLobalstar to the market that here [sic] be no gap [in operations], Defendants repeatedly advised investors that the satellites would provide 'commercially viable' . . . service . . . 'into 2010'").)

These allegations of knowing and deliberate misrepresentations fundamentally sound in fraud. Accordingly, because of the conduct alleged in the CSAC, I find that Rule 9(b)'s heightened pleading standards should also apply to the claims against the Underwriter Defendants. See Leadis, 2006 WL WL 496039, at *3-4 (applying heightened pleading standards to section 11 and 12 claims against underwriter defendants where the underlying theory of liability sounded in fraud.)

B.   Analysis

i.   Section 11 and 12(a)(2) Claims Against All Defendants

1.   The Prospectus Statements Regarding Globalstar's Voice
Quality, Ability to Attract New Customers, Constellation
Viability

The Defendants contend that the statements regarding the quality and longevity of Globalstar's satellite communications network are not actionable because (1) both their phrasing and cautionary language in the Prospectus clarified that they were predictions of the future that may not come to fruition for a variety of reasons, including degradation of the type that ultimately occurred, and (2) Plaintiff has not adequately alleged particularized facts indicating that they were untrue when made.  For the reasons that follow, the Court agrees.

Alleged misstatements in a prospectus are material within the meaning of Sections 11 and 12 if, when viewed in context, they "would have misled a reasonable investor about the nature of the [security]." Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) (quoting McMahon & Co. v. Wherehouse Entm't, Inc., 900 F,2d 576 (2d Cir. 1990).  Recognizable expressions of "puffery and corporate optimism" are generally deemed immaterial. Rombach, 355 F.3d 164, at 174. Further, under the well-established "bespeaks caution" doctrine, an alleged misstatement is not actionable where investors were adequately

warned of the relevant investment risks. Halperin v. EBanker USA.com, Inc., 295 F.3d 352, 357 ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."). Defendants cannot, however, insulate themselves from liability by casting dangers that have already come to pass as mere risks that may occur at some point in the future. Rombach, 355 F.3d 164, 173.

Even a peremptory reading of the contested statements reveals that many contain expressions of corporate optimism couched in subjective terms of belief, expectation, and intention. (See, e.g., Prospectus, at 2 ("We believe that . . . our constellation will continue to provide acceptable service at least into 2010"), 3 ("We believe we are able to retain our current customers and attract new customers . . . We believe our existing network is capable of handling the expected growth"), 16 ("We expect that our current satellite constellation will provide commercially viable service into 2010), ") 76 ("We believe our high quality and low cost services and products offer us a competitive advantage  . . . We believe our existing network is capable of handling the expected growth in demand for our services")). Such language, at a minimum, signals to prospective investors that the predictions of the Company may

32

not come to fruition. See, e.g., San Leandro Emergency Medic. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 811 (2d Cir. 1996) (finding that defendants' general comments that it was "optimistic" about earnings and "expected" good future performance were mere puffery that cannot have misled a reasonable investor); In re Nokia Oyj Sec. Litig., 423 F.Supp.2d 364, 398 (S.D.N.Y. 2006) (statement that "[w]e expect to see continued momentum . . . going into the fourth quarter" could not sustain a securities fraud claim "because it is a general statement of corporate optimism"); In re Bristol Myers Squibb Sec. Litig., 312 F.Supp.2d 549, 557 (S.D.N.Y. 2004) (finding that statements such as "we think that this is a tremendous strategic opportunity" and the disputed product will "hopefully" be ready for the market next year were not actionable).

Furthermore, the Prospectus contained multiple and prominent cautions regarding past, then-existing, and potential problems with its satellite network. It disclosed that Old Globalstar launched 52 satellites in 1998, nine of which had since failed, causing the Company to reconfigure its constellation from an orbital pattern of 48 to a pattern of 40.

(Prospectus, at 15,[13] 43, 89.) Of these nine failures, eight were directly attributable to "a common anomaly in the . . . S-Band antenna." (Id.) Investors were further advised that "this anomaly has occurred in 16 of our other satellites, a majority of which have been or in the process of being returned to service." (Id., at 15). While the Prospectus also said that Globalstar "subsequently learned to control and mitigate this type of anomaly," it specified that future S-Band antenna problems "have the potential for a significant operational impact." (Id., at 89). Thus, investors were informed that more than 15% of Globalstar's satellites had failed completely since launch, and another 30% had experienced difficulties of a similar nature to those disclosed in Globalstar's February, 2007 8-K.

The Prospectus also warned investors of both potential and actual degradation of Globalstar's network and services. In one prominent example, the Prospectus states:

As our constellation has aged, the quality of our satellites' signals has diminished, and may continue to diminish, adversely affecting the reliability of our service. . . We have been advised by our customers and others of temporary intermittent losses of signal cutting off calls in progress or preventing completions of calls when made. If these problems

---

[13] This information is contained under a boldfaced section heading which reads: "Our satellites have a limited life and may fail prematurely, which would cause our network to be compromised and materially and adversely affect our business, prospects, and profitability." (Id.)

34

increase, they could affect adversely our business and
our ability to complete our business plan.

Id., at 15.

Indeed, the Prospectus's numerous references to the
anticipated launch of spare satellites and the Second Generation
constellation, for which revenue from the IPO would pay, are
clear indications that the Company needed to replace its
existing satellite fleet.[14] (Id. at 2, 16, 43, 88, 89).

Plaintiff's contention that the cautionary language in the
Prospectus is insufficient to support application of the
"bespeaks caution" doctrine because it is too generic is not
convincing. (Pl. Mem., at 22.) The fundamental premise of the
CSAC is that Globalstar's post-IPO filing advising investors of
the severity of S-band antenna deterioration belies the
statements made in the Prospectus. (CSAC ¶¶ 70-73.) However,
the cautionary language above informs investors of issues
potentially arising from this exact difficulty.

Plaintiff argues that the statements are nonetheless
actionable because Globalstar knew at the time of the IPO that
its network was deteriorating and would not remain commercially

---

[14] These disclosures also fatally undermine Plaintiff's
allegation that the October 16, 2006 Satellite Week article
belies statements made in the Prospectus. (See CSAC ¶ 4.) As
Defendants observe (and Plaintiff does not deny), the article
used information derived from Globalstar's previous public
filings and the problems identified in connection with the aging
of Globalstar's fleet were fully disclosed in the Prospectus
itself. (Globalstar Mem., at 24; Prospectus, at 15, 89.)

viable into 2010. (Pls. Mem. at 19-20); see Nokia, 423 F.Supp.2d
364, at 397 ("optimistic projections of future performance may
be actionable upon a showing that the defendants did not
genuinely or reasonably believe the positive opinions they
touted."). This assertion is based on unspecified internal
reports Iridium generated "[d]uring the summer and fall of 2006"
(CSAC ¶ 60), a third party study conducted by Frost and Sullivan
in late-January 2007 (id. ¶ 77), the Company's subsequent public
filings (id. ¶¶ 85-90, 107), and the alleged results of
undisclosed internal Globalstar testing conducted by anonymous
individuals (id. ¶¶ 50-53). None of these can sustain a claim
under the heightened pleading requirements of Rule 9(b).

The allegations regarding internal Iridium reports and the
study performed by Frost and Sullivan are plainly insufficient
to establish that Globalstar knew the severity of its S-band
antenna problems at the time of the IPO. With regard to the
former, there is no allegation that Globalstar knew of Iridium's
"confidential internal reports" in early November of 2006. (CSAC
¶ 84.) Quite to the contrary, the CSAC clearly indicates that
Iridium did not release its findings until, at the earliest,
February of 2007. (Id. ¶¶ 82, 84.) Similarly, the Frost and
Sullivan study was not performed until two months *after* the IPO
and was not published until *after* Globalstar issued its
February, 2007 8-K. (Id. ¶ 77).

Plaintiff's reliance on Globalstar's post-IPO public

filings is also misplaced. The February 2007 8-K states, in

pertinent part:

> As reported in the Company's prior public filings, in
> early 2006 the Company undertook a comprehensive
> third-party review of . . . the likely impact of the
> degradation of performance of [the S-band antenna]
> amplifiers in individual satellites on the performance
> of the constellation as a whole. At that time, based
> in part on the third-party report, the Company
> concluded that, although there was risk, with the
> addition of the eight spare satellites in 2007, the
> constellation would continue to provide commercially
> viable two-way communication services until the next
> generation satellites were placed in service in 2009.
> Based on data recently collected from satellite
> operations, the Company has concluded that the
> degradation of the amplifiers is now occurring faster
> than previously experienced and faster than the
> Company had previously anticipated.

The CSAC alleges that the February 2007 8-K's reference to

a third party study begun in 2006 is really an admission that

Globalstar knew the severity of the S-Band antenna problem "by

early 2006." (CSAC ¶ 107.) Nothing supports this inference.

All the February 2007 8-K says is that "recently collected" data

shows that the problem was more severe "than the Company had

previously anticipated." In its brief, Plaintiff asserts that

the reference to analysis of "recent" data means that the

Company knew the severity of the S-Band antenna problem at the

time of the IPO because "consultations with third-party experts

would have taken time." (Pl. Mem., at 23.) This is exactly the

sort of speculation that cannot withstand a motion to dismiss. See Twombly, 127 S. Ct. 1955, at 1969.

Similarly, the 2006 10-K statement that "[e]ffective October 1, 2006, the Company reduced the estimated remaining lives" for its satellites does not adequately support the contention that Globalstar knew its satellites were rapidly deteriorating at the time of the IPO. The crux of Plaintiff's allegations is that, even though the 2006 10-K was issued in April of 2007, it was an admission that Globalstar knew of accelerated degradation of the S-Band antenna "in the very same quarter that the IPO occurred" (CSAC ¶ 89.) Even accepting this allegation on its face,[15] the CSAC does not specify *when* in the fourth quarter of 2006 the accelerated degradation occurred, and thus cannot support the inference that the Company planned to reduce its estimate of satellite longevity in November.

The claims arising from Prospectus statements regarding the quality and longevity of Globalstar's network ultimately rely on

---

[15] Defendants argue convincingly that special rules come into play when dealing with new information affecting the service life of an asset. (Globalstar Mem. 35-36). Specifically, AU Section 560 requires a company to make an adjustment where new information is obtained between the balance sheet date (December 31, 2006) and the issuance of the next financial statement (April 2007). Further, because satellite degradation occurs over time, the resulting adjustment should be reported "as of the beginning of the earliest period for which retroactive application is practicable," which in this case was October 1, 2006 (the first day of the fourth quarter). (Globalstar Mem., at 36n.35 (quoting SFAS 154, Opinion 20).)

the purported contents of confidential internal monitoring
activities. To state a fraud claim on this basis, Plaintiff
must give corroborating details, such as who conducted and
analyzed the monitoring, what the reports generated during the
course of such monitoring activities said, and why. See, e.g.,
Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital
Inc., 531 F.3d 190, 196 (allegations of fraud based on contrary
information contained in confidential reports must "specifically
identify the reports or statements containing this
information."), quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d
Cir. 2000)); Abrams v. Baker Hughes, Inc., 292 F.3d 424, 432
(5th Cir. 2002)(claims predicated on the existence of
confidential reports contradicting a public disclosure must
specify authors, recipients, and contents); San Leandro, 75 F.3d
801, 812 (An "unsupported general claim of the existence of
confidential company sales reports that revealed the larger
decline in sales is insufficient to support a motion to
dismiss").

Plaintiff has not met this burden. The CSAC alleges only
that: "teams of satellite engineers" monitor Globalstar
satellites on a daily basis (CSAC ¶ 50); reports concerning
"satellite health and performance", in unspecified form and
prepared by anonymous personnel, are given to three named
managers, who "reported directly" to the Individual Directors on

a daily basis (id.); analysis at an unknown date by unnamed persons of data purportedly gathered from these activities revealed that "[b]y July and August 2006, diminished signal strength was clearly problematic" (id.); and plots from the data revealed, "[i]n June 2006 . . . that the constellation would cease all commercial viability in 2008" (id. ¶ 51). The CSAC not only fails to identify who prepared or analyzed this data and when, it says nothing about *why* estimations based on the purported analysis showed that the Company's satellites would expire in 2008, or *why* signal strength was diminishing. Such generalized allegations do not satisfy Rule 9(b)'s particularized pleading requirement. See Abrams, 292 F.3d 424, at 432 ("An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to state a claim."), San Leandro, 75 F.3d 801, 812 (same).[16]

Because the "bespeaks caution" doctrine applies to the challenged statements regarding Globalstar network quality and

---

[16] Furthermore, even accepting the allegations pertaining to Globalstar's internal monitoring as true, they are not necessarily inconsistent with the Prospectus statements. With regard to network degradation, the Company disclosed that its constellation was aging, signal quality had diminished, and customers were reporting dropped calls. (Prospectus, at 15.) With respect to long-term constellation viability, the CSAC does not allege that deterioration in satellite S-band antenna, the problem disclosed in the February 2007 8-K, is what necessitated a reduced estimate of satellite longevity. (See CSAC ¶¶ 50-53.)

40

longevity and Plaintiff has not adequately pled facts indicating that Globalstar knew at the time of the IPO that they had no basis in fact, the claims with respect to these statements are dismissed.

## 2. The Prospectus Statements Regarding the Number of Functioning Satellites

Plaintiff's allegation that the Prospectus misrepresented the number of commercially viable satellites also lacks the particularity required by Rule 9(b). This allegation is entirely dependent on information purportedly obtained at an unspecified date from "confidential sources." (CSAC ¶ 110.) Since the CSAC offers no other corroborative facts, the claim is simply too vague and conclusory to state a claim.[17] See Novak, 216 F.3d 300, at 314 (where securities fraud plaintiffs rely on confidential sources, they must also plead other facts providing "an adequate basis for believing that the defendants' statements were false.) Accordingly, Plaintiff's claims with respect to this statement are dismissed.

---

[17] Additionally, the information purportedly provided from these sources does not clearly contradict the Prospectus, which nowhere stated that 43 of Globalstar's satellites were "fully functioning." (See Prospectus, at 87 ("Our satellite network includes 43 in-orbit satellites, *including in-orbit spares temporarily placed into service and satellites that are temporarily out of service* but considered restorable.")(emphasis added).)

41

### 3. Prospectus Statements Regarding ATC Services

The claim with respect to statements about ATC services must also be dismissed. Like those regarding the health and viability of Globalstar's satellites, these statements fall within the ambit of the "bespeaks caution" doctrine. The passage quoted by the CSAC clearly indicates that the Company did not provide ATC services at the time of the IPO and hoped to be among the first to do so. (Prospectus, at 3; CSAC ¶ 112.) Plaintiff contends, however, that Globalstar had no reasonable basis for making the statements because the FCC requires forty-one "fully functioning" satellites to support ATC services and the same confidential sources discussed supra indicated that it had only thirty-seven. I have already found that Plaintiff's allegations in this regard are deficient.

### 4. Prospectus Statements Regarding Subscriber and Sales Growth

Lastly, the CSAC alleges that that the Prospectus was misleading because of the way it reported subscriber growth. (CSAC ¶¶ 58-59, 99.) Notably, Plaintiff does not challenge the truthfulness of any concrete number reported in the Prospectus. Nor does it even dispute that the subscriber base actually grew through all four quarters of 2006 -- a result Globalstar could not even have known at the time of the November 2006 IPO. (Id. ¶ 57.) Instead, the CSAC posits that degradation of Globalstar's satellites during the summer of 2006 was driving

42

away high-revenue voice subscribers at an accelerated rate. (Id. ¶ 99.) Thus, according to the CSAC, the growth in total subscribership reported in the Prospectus was "deceptive" because it reflected an increase in lower revenue-generating data customers rather than voice customers. (Id. ¶ 58.)

The Court first observes that, yet again, a number of the contested statements include expressions of belief and intention. (Prospectus, at 73 ("We believe the heightened demand for reliable communications services . . . will continue to drive our strong growth"), 77 ("We intend to continue to increase our penetration of the growing mobile satellite services market.").) Given the cautionary language outlining the risks of satellite degradation previously noted, Plaintiff must therefore allege facts showing that Globalstar had no reasonable basis for believing it would continue to gain voice customers after the IPO in order to state a claim.

Plaintiff has not done so. First, as Defendants observe and Plaintiff does not challenge, the Prospectus did actually divulge that data customers were increasing relative to voice-only customers.[18] (Globalstar Mem., at 25; Underwriter Mem., at 22; see also Pl. Mem. 28-31.) Second, Plaintiff relies on

---

[18] "Although a majority of our subscribers utilize our network principally for voice communications, an increasing portion of our revenue is derived from the sale of high and low speed data services, including our Simplex one-way data transmission service." (Prospectus, at 44.)

43

Globalstar's fourth quarter 2006 "churn rate"[19] of 1.4% to support its contention that Globalstar was rapidly losing voice customers. However, this churn rate is not inconsistent with Globalstar's churn rates for prior years (1.51% for the year ended December 31, 2004; 1.27% for the year ended December 31, 2005).[20] (Prospectus, at 10.) Furthermore, even assuming Globalstar did lose more than the usual historic number of voice subscribers in the fourth quarter of 2006, Plaintiff has not pled legally sufficient facts showing why Globalstar would have known this would happen when the IPO occurred (two months before the quarter ended). The claims with respect to the Prospectus statements regarding subscriber growth must therefore be dismissed.

---

[19] Churn rate is defined as the "aggregate number of . . . subscribers (excluding Simplex customers and customers of independent gateway operators) who cancel service during a month, divided by the average number of retail subscribers during the month." (Prospectus, at 11 n.7.)

[20] Defendants also ably demonstrate that the appropriate distinction in terms of revenue is not between data and voice, but between Simplex and Duplex (which is charged at the same rates as, and includes, voice customers). (Globalstar Mem., at 26-27; Prospectus, at 10, 80, and 82.) Churn rates are calculated using only Duplex subscribers. (Prospectus, at 11 n.7.) Thus, the consistency of the reported churn rates relative to prior years suggests that higher-revenue subscribers were not, in fact, canceling their subscriptions at an accelerated rate.

44

## ii. Section 15 Claims Against the Individual Defendants

Because Plaintiff has not adequately alleged a primary violation of Sections 11 or 12, the Section 15 claims must also be dismissed.

## III. Dismissal with Prejudice

Plaintiff requests permission to replead (Pl. Mem., at 53) and Defendants ask that the CSAC be dismissed with prejudice (Globalstar Mem., at 44; Underwriter Mem., at 25). While leave to amend should be given freely, particularly where dismissal results in part from an application of Rule 9(b), it is not warranted where amendment would be futile. See Acito, 47 F.3d 47, at 55. Here, Plaintiff was permitted to amend its complaint more than two months after receiving a letter from Globalstar's counsel outlining the perceived deficiencies in the FCAC and engaging in multiple discussions and partial discovery with Defendants. (Laitman Decl., ¶¶ 11-17.) Furthermore, the vast majority of Plaintiff's allegations are protected by the "bespeaks caution" doctrine and would not state a claim even under Rule 8(a)'s liberal pleading standards. See Rombach, 355 F.3d 164, 176 (declining to direct district court to allow plaintiffs to replead Section 11 and 12 claims in negligence where such a claim "would be defeated in any event by the bespeaks caution doctrine.") Thus, I find that dismissal with prejudice is warranted. See San Leandro, 75 F.3d 801, at 815

(denying leave to replead where "the District Court had already granted plaintiffs the right to amend their complaint once."); Ultrafem, 91 F.Supp.2d 678, at 704 (same).

IV. Conclusion

For the reasons stated above, while I reject Defendants arguments for dismissal on the basis of service of process, I conclude that dismissal is warranted on the basis of Rules 9(b) and 12(b)(6). Accordingly, Defendants' motions to dismiss (Docket Nos. 37, 42) are granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated:     New York, New York
           September 30, 2008

LORETTA A. PRESKA, U.S.D.J.